Michael Boyle,
1900 NE 3rd St Ste 106
Bend, OR 97701
Telephone: (541) 640-9081
Email: mboyle2016@gmail.com

FILED 25 OCT '22 11:36 USDC-ORE

Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| **MICHAEL BOYLE,** an individual, | ) |
| | ) Case No. 6:22-cv-01361-AA |
| Plaintiff, | ) |
| | ) **PLAINTIFF EXHIBITS 1-38** |
| v. | ) |
| | ) |
| **DESCHUTES COUNTY SHERIFF L.** | ) |
| **SHANE NELSON,** in his Individual | ) |
| Capacity and in His Official Capacity as | ) |
| Sheriff for the County of Deschutes; and | ) |
| **MICHAEL HUDSON,** an Individual and in | ) |
| his official capacity, and **JASON JANES,** an | ) |
| Individual and in his official capacity, | ) |
| and **CHAD DAVIS**, an Individual and in | ) |

his official capacity, and **THOMAS
LILIENTHAL** an Individual and in his official
capacity and, **BRYAN MORRIS** an Individual)
and in his official capacity and **LIAM KLATT,**
an Individual and in his official capacity and,
**DESCHUTES COUNTY**, a political
subdivision of the State of Oregon,

Defendants

# EXHIBIT 1

This site was designed with the **WIX**.com website builder. Create your website today.  ( Start Now )



### The Hoppiest Place On Earth

DESCHUTES
RESERVE
*Club*

## *The World's Only Craft Brew Inspired Spa*

### *Craft Beer Inspired Microbrew Soaks*

*Hop In The Spa* Microbrew Soaks use a combination of hops, herbs, minerals and other proprietary ingredients. These ingredients, along with variable water temperatures, provide the Hop HydroTherapy experience that only our customers enjoy. This experience is unique at *Hop In The Spa* as it was designed to provide a relaxing therapeutic treatment unlike any other in the world.

#### Metolious River MicroBrew Soak

Relaxes your body and mind as it rids your body of anything that ails you.
- 60-minute Hop HydroTherapy
- 100-102 degrees water temperature
- Brewed hops & minerals
- Beer Belly pretzels, Central Oregon's only authentic Bavarian pretzel

*$189.00 per couple*





#### Barrel Aged MicroBrew Soak

Therapeutic relaxing soak in our Hop Tubs

Plaintiff Exhibit
# 1
Date 09/12/2022
Case # 6:22-CV-01361-AA

This site was designed with the **WiX**.com website builder. Create your website today.  ( Start Now )

- Charcuterie Board (meat, cheese, olives)  *Vegan option upon request
- 90-minute Hop HydroTherapy soak
- Enhanced blend of hops, herbs and minerals

*$239.00 per couple*



## Mirror Pond MicroBrew Soak & Pub Package

Hop Tubs and a pub lunch or dinner

Therapeutic soak in our Hop Tubs

- Paired Pub Tasting
- Unlimited Hop HydroTherapy soak time in our Hop Tubs
- Enhanced blend of hops, herbs and minerals
- Deschutes Brewery Beers
- Charcuterie Board (meat, cheese, olives)  *Vegan option upon request
- Beer Belly pretzels, Central Oregon's only authentic Bavarian pretzel.
- Pub lunch or dinner in private dining room
- Laird Hamilton Superfoods Coffee and dessert

*$279.00 per couple*
*~Add Gift Basket $299.00*



## The Reserve MicroBrew Soak & Dinner Package

All the "hoppiness" with a 3 course dinner and dessert

Therapeutic soak in our Hop Tubs

- Paired Pub Tasting
- Unlimited Hop HydroTherapy Soak Time in our Hop Tubs
- Enhanced blend of hops, herbs and minerals
- Beer Belly pretzels, Central Oregon's only authentic Bavarian pretzel
- Charcuterie Board (meat, cheese, olives)  Vegan option upon request
- 3 Course Paired dinner in our private dinning room
- Laird Hamilton Superfoods Coffee and dessert
- Deschutes Reserve Bottle

*$329.00 per couple*
*~Add Gift Basket $379.00*



EX

Plaintiff Exhibit
# 7
Date 09/12/2022
Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 2

  
 Gmail                                    **Mike Boyle <mboyle2016@gmail.com>**

## Hop in Spa License
4 messages

**HANCOCK Randy \* OLCC** <Randy.Hancock@oregon.gov>                    Wed, Sep 4, 2019 at 3:39 PM
To: Mike Boyle <mboyle2016@gmail.com>

Mike,

I received verification that the liquor license for Hop in the Spa was effectively surrendered today with an inactive date of 8/20/19 per Sally's request. As such, there is no longer a valid liquor license; therefore, products may not be sold. At this time you could "give" alcoholic beverages to any person requesting it, but should not advertise, and must not limit the free service to only customers/patrons. As always, you may not provide alcohol to any person under the age of 21 or any person showing signs of intoxication. In addition, you cannot accept tips or donations relate to the service of free alcohol or use it as an incentive or prize in anyway.

If you wish to obtain a liquor license in the future you will need to go through the formal application process and await approval.

Thanks, and best of luck to you.

PLEASE NOTE I HAVE A NEW OFFICE NUMBER LISTED BELOW

Regards,

**RANDY HANCOCK**

Regulatory Specialist / District Inspector

Oregon Liquor Control Commission

336 SW Cyber Dr. #104 Bend, OR 97702

O: 541-280-9468 | F: 541-388-6321

Randy.Hancock@oregon.gov

www.oregon.gov/OLCC

This communication and any attachments may contain privileged or confidential information intended for a specific individual and purp---
are not the intended recipient, you should delete this communication and any attachments, and are notified that any disclosure, copyi
communication and any attachments, or the taking of any action based on it, is strictly prohibited.

Plaintiff Exhibit
# 2
Date 09/12/2022

**Mike Boyle** <mboyle2016@gmail.com>                                    W    Case # 6:22-CV-01361-AA

2

To: HANCOCK Randy * OLCC <Randy.Hancock@oregon.gov>

Thanks for getting back to me.

Is there a way to get a  continuation while I am applying for a new license should I decide to apply?
[Quoted text hidden]

**HANCOCK Randy * OLCC** <Randy.Hancock@oregon.gov>          Wed, Sep 4, 2019 at 3:45 PM
To: Mike Boyle <mboyle2016@gmail.com>

Basically, no, not after surrender as that effectively terminates the license, unlike a change of ownership where continuation can exist since the previous owner would still be involved.

If you apply in the first 30 days during the surrender you "may" be eligible for a temporary license while they process your application, but that requires submission of the full licensing packet, completion of server's education (and a service permit), and completion of the background portion.  That is all handled out of Portland through the licensing division, but nothing will happen until you submit a complete app.

Visit our website and you can download/complete the application forms to be submitted to OLCC.

Randy

[Quoted text hidden]

**Mike Boyle** <mboyle2016@gmail.com>                         Wed, Sep 4, 2019 at 4:02 PM
To: HANCOCK Randy * OLCC <Randy.Hancock@oregon.gov>

Ok, thanks for the clarification.
[Quoted text hidden]

**EXHIBIT 2**

# EXHIBIT 3



> Go to previous versions of this Section                                                ▼

# 2017 Oregon Revised Statutes
# Volume : 15 - Occupations
# Chapter 687 - Massage Therapists;
# Direct Entry Midwives
# Section 687.011 - Definitions.

**Universal Citation:** OR Rev Stat § 687.011 (2017)

As used in ORS 687.011 to 687.250, 687.895 and 687.991:

(1) "Board" means the State Board of Massage Therapists.

(2) "Certified class" means a class that is approved by the board and is offered:

(a) By a person or institution licensed as a career school under ORS 345.010 to 345.450;

(b) By a community college and approved by the Higher Education Coordinating Commission;

(c) By an accredited college or university; or

(d) In another state and licensed or approved by the appropriate agency in that state.

(3) "Manual" means the use of the hands, feet or any other part of the body in the performance of massage.

(4)(a) "Massage," "massage therapy" or "bodywork" means the use of pressure, friction, stroking, tapping or kneading on the human body, or the use of vibration or stretching on

# EXHIBIT 3



the human body by manual or mechanical means or gymnastics, with or without appliances such as vibrators, infrared heat, sun lamps or external baths, and with or without lubricants such as salts, powders, liquids or creams, for the purpose of, but not limited to, maintaining good health and establishing and maintaining good physical condition.

(b) "Massage," "massage therapy" and "bodywork" do not include the use of high-velocity, short-amplitude manipulative thrusting procedures to the articulations of the spine or extremities.

(5)(a) "Massage facility" means a facility where a person engages in the practice of massage.

(b) "Massage facility" does not include:

(A) A career school licensed under ORS 345.010 to 345.450;

(B) An accredited college or university or a community college operated under ORS chapter 341; or

(C) A clinic or facility owned or operated by a person authorized to practice a profession by a health professional regulatory board, as defined in ORS 676.160.

(6) "Massage therapist" means a person licensed under ORS 687.011 to 687.250, 687.895 and 687.991 to practice massage.

(7) "Practice of massage" means the performance of massage:

(a) For purposes other than sexual contact, as defined in ORS 167.002 (5); and

(b) For compensation.

(8) "Preceptor" means a licensed massage therapist who contracts with an approved school or program of massage to provide direct on-site clinical supervision of a student enrolled in a certified class.

(9) "Supervision" means:

(a) The process of overseeing and directing the training of students enrolled in a certified class as set forth in the rules of the board;

(b) The process of overseeing and directing a licensee, or a person that has a permit to operate a massage facility, who is being disciplined by the board; or

EXHIBIT 3 2/3



(c) Voluntary consultation with, and education of, less experienced licensed massage therapists or practitioners in related fields.

(10) "Unprofessional or dishonorable conduct" means a behavior, practice or condition that is contrary to the ethical standards adopted by the board. [1955 c.492 §1; 1977 c.507 §1; 1979 c.89 §1; 1985 c.82 §1; 1987 c.158 §144; 1989 c.841 §1; 1993 c.45 §295; 1995 c.343 §60; 1997 c.626 §2; 1999 c.39 §9; 1999 c.537 §5; 2011 c.103 §1; 2013 c.409 §1; 2013 c.747 §183; 2015 c.491 §1]

**Disclaimer:** These codes may not be the most recent version. Oregon may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

3

# EXHIBIT 3.1

**687.010** [Repealed by 1955 c.492 §15]

## MASSAGE THERAPISTS

(Generally)

**687.011 Definitions.** As used in ORS 687.011 to 687.250, 687.895 and 687.991:

(1) "Board" means the State Board of Massage Therapists.

(2) "Certified class" means a class that is approved by the board and is offered:

(a) By a person or institution licensed as a career school under ORS 345.010 to 345.450;

(b) By a community college and approved by the Higher Education Coordinating Commission;

(c) By an accredited college or university; or

(d) In another state and licensed or approved by the appropriate agency in that state.

(3) "Manual" means the use of the hands, feet or any other part of the body in the performance of massage.

(4)(a) "Massage," "massage therapy" or "bodywork" means the use of pressure, friction, stroking, tapping or kneading on the human body, or the use of vibration or stretching on the human body by manual or mechanical means or gymnastics, with or without appliances such as vibrators, infrared heat, sun lamps or external baths, and with or without lubricants such as salts, powders, liquids or creams, for the purpose of, but not limited to, maintaining good health and establishing and maintaining good physical condition.

(b) "Massage," "massage therapy" and "bodywork" do not include the use of high-velocity, short-amplitude manipulative thrusting procedures to the articulations of the spine or extremities.

(5)(a) "Massage facility" means a facility where a person engages in the practice of massage.

(b) "Massage facility" does not include:

(A) A career school licensed under ORS 345.010 to 345.450;

(B) An accredited college or university or a community college operated under ORS chapter 341; or

(C) A clinic or facility owned or operated by a person authorized to practice a profession by a health professional regulatory board, as defined in ORS 676.160.

(6) "Massage therapist" means a person licensed under ORS 687.011 to 687.250, 687.895 and 687.991 to practice massage.

(7) "Practice of massage" means the performance of massage:

(a) For purposes other than sexual contact, as defined in ORS 167.002 (5); and

(b) For compensation.

(8) "Preceptor" means a licensed massage therapist who contracts with an approved school or program of massage to provide direct on-site clinical supervision of a student enrolled in a certified class.

(9) "Supervision" means:

(a) The process of overseeing and directing the training of students enrolled in a certified class as set forth in the rules of the board;

(b) The process of overseeing and directing a licensee, or a person that has a permit to operate a massage facility, who is being disciplined by the board; or

(c) Voluntary consultation with, and education of, less experienced licensed massage therapists or practitioners in related fields.

(10) "Unprofessional or dishonorable conduct" means a behavior, practice or condition that is contrary to the ethical standards adopted by the board. [1955 c.492 §1; 1977 c.507 §1; 1979 c.89 §1; 1985 c.82 §1; 1987 c.158 §144; 1989 c.841 §1; 1993 c.45 §295; 1995 c.343 §60; 1997 c.626 §2; 1999 c.39 §9; 1999 c.537 §5; 2011 c.103 §1; 2013 c.409 §1; 2013 c.747 §183; 2015 c.491 §1]

**EXHIBIT 3**

**687.020** [Repealed by 1955 c.492 §15]

**687.021 Practice of massage without license prohibited; operation of massage facility without permit prohibited; injunction against violation.** (1) A person may not:

(a) Engage in or purport to engage in the practice of massage without a massage therapist license issued by the State Board of Massage Therapists under ORS 687.051.

(b) Operate a massage facility or purport to operate a massage facility without a permit issued by the board under ORS 687.059, unless the person is an individual massage therapist who is working out of the individual's home.

(c) Advertise that the person engages in the practice of massage unless the person is licensed under ORS 687.051 or holds a permit under ORS 687.059.

(d) Use the word "massage" in a business name unless the person is licensed under ORS 687.051 or holds a permit under ORS 687.059.

(2) The board may exempt by rule a type of massage facility from the prohibition in subsection (1)(b) of this section if the board finds that requiring a permit for that type of facility is not necessary to regulate the practice of massage therapy or to protect the health and safety of the public.

(3) The Attorney General, the prosecuting attorney of any county or the board may maintain an action for an injunction against a person violating this section. An injunction may be issued without proof of actual damages sustained by a person. An injunction does not relieve a person from criminal prosecution for violating this section or from any other civil, criminal or disciplinary remedy. [1955 c.492 §2; 1971 c.650 §36; 1977 c.507 §2; 1979 c.89 §2; 1985 c.82 §2; 1989 c.841 §2; 1997 c.626 §3; 1999 c.537 §6; 2013 c.409 §2]

**687.030** [Amended by 1953 c.438 §2; repealed by 1955 c.492 §15]

**687.031 Application of ORS 687.011 to 687.250, 687.895 and 687.991.** (1) ORS 687.011 to 687.250, 687.895 and 687.991 do not apply to:

(a) Persons licensed under any other law of this state to do any acts included in the definition of massage in ORS 687.011 or persons working under the direction of any such person.

(b) Trainers of any amateur, semiprofessional or professional athlete or athletic team.

(c) Massage practiced at the athletic department of any institution maintained by public funds of the state or of any of its political subdivisions.

(d) Massage practiced at the athletic department of any school or college.

(e) Massage clinics operated as part of a certified class for the purpose of student training supervised by an approved instructor or preceptor if:

(A) Any charge for the massage does not exceed the cost incurred in providing the massage; and

(B) The student is not compensated.

(f) Students enrolled in a certified class when practicing massage techniques in a nonclinical setting, at or away from massage school premises or program sites, under the supervision of an approved instructor or preceptor, if:

(A) The student is clearly identified as a student to any member of the public receiving massage services; and

(B) The student is not compensated.

(g) Nonresident practitioners holding a valid license, permit, certificate or registration issued by any other state or territory of the United States or by a foreign country and temporarily practicing massage in this state for a period not exceeding 30 days for the purpose of:

(A) Presenting educational or clinical programs, lectures, seminars or workshops;

(B) Furnishing massage services during an emergency as part of a disaster response team; or

EXHIBIT 3.*i*

(C) Consulting with a massage therapist licensed in this state regarding massage practices or services.

(h) Trained or licensed practitioners of psychotherapy or counseling modalities that use physical techniques to access or support psychotherapeutic processes when practicing within the scope of a license or if the practitioner has an express oral or written agreement that the sole intent in using the physical techniques is to render the psychotherapy or counseling.

(i) Practitioners of reflexology who do not claim expressly or implicitly to be massage therapists and who limit their work to the practice of reflexology through the application of pressure with the thumbs to reflex points on the feet, hands and ears for the purpose of bringing the body into balance, thereby promoting the well-being of clients.

(j) Practitioners who:

(A) Do not claim expressly or implicitly to be massage therapists;

(B) Limit their work to one or more of the following practices:

(i) Using touch, words and directed movement to deepen awareness of existing patterns of movement and suggest new possibilities of movement;

(ii) Using minimal touch over specific points on the body to facilitate balance in the nervous system; or

(iii) Using touch to affect the energy systems or channels of energy of the body;

(C) Are certified by a professional organization or credentialing agency that:

(i) Requires a minimum level of training, demonstration of competence and adherence to an approved scope of practice and ethical standards; and

(ii) Maintains disciplinary procedures to ensure adherence to the requirements of the organization or agency; and

(D) Provide contact information in the practitioner's place of business for any organization or agency that has certified the practitioner.

(2) The State Board of Massage Therapists has the authority to verify that a practitioner claiming to be exempt from application of ORS 687.011 to 687.250, 687.895 and 687.991 under subsection (1)(j) of this section is certified by a professional organization or credentialing agency as required by subsection (1)(j)(C) of this section.

(3) A nonresident practitioner performing massage under subsection (1)(g) of this section must obtain a temporary practice permit if practicing in this state for a total of more than 30 days in a calendar year. Applications must be accompanied by the application fee provided for in ORS 687.071. A temporary practice permit shall allow the nonresident practitioner to practice massage in this state for a maximum of 180 days in a calendar year. [1955 c.492 §12; 1985 c.82 §3; 1993 c.564 §1; 1997 c.626 §4; 1999 c.537 §7; 2007 c.332 §1; 2011 c.44 §1]

**687.040** [Repealed by 1955 c.492 §15]

(Licensing of Massage Therapists and Permitting of Massage Facilities)

**687.041 Applications for licenses.** (1) Applications to the State Board of Massage Therapists for a massage therapist license shall be made on forms provided by the board and shall contain the information required to assure the board of the applicant's eligibility for a license. The application fee provided for in ORS 687.071 shall accompany the application.

(2) An applicant shall state on the application whether the applicant has ever been arrested for or convicted of a crime exclusive of minor traffic offenses and if so, where and when.

(3) The board may require that an applicant submit to fingerprinting and may use the fingerprints to request a criminal records check of the applicant under ORS 181A.195. It may also require the photograph of the applicant.

EXHIBIT 3 ./

(4) All law enforcement agencies in this state shall cooperate with the board in the administration of ORS 687.011 to 687.250, 687.895 and 687.991 and shall, when requested, investigate and report to the board their findings regarding the arrest or conviction of the applicant for crimes within or outside this state. [1955 c.492 §3; 1957 c.166 §1; 1977 c.507 §6; 1979 c.89 §3; 1989 c.841 §3; 1997 c.626 §5; 1999 c.537 §8; 2005 c.730 §36]

**687.050** [Repealed by 1955 c.492 §15]

**687.051 Qualifications of applicants; continuing education; license renewal; inactive status; rules.** (1) To be eligible for issuance of an initial license in this state as a massage therapist, the applicant shall:

(a) Furnish the State Board of Massage Therapists with personal references required by rule of the board.

(b) Have attained the age of 18 years.

(c) Furnish the board with educational certificates or transcripts required by law or rule of the board including but not limited to proof of certification in cardiopulmonary resuscitation.

(d)(A) Have completed a minimum of 625 contact hours of certified classes in the following subjects:

(i) Anatomy and physiology;

(ii) Kinesiology;

(iii) Pathology;

(iv) Theory; and

(v) Hands-on practice of massage or bodywork techniques and professional practices, including client communication and boundaries, professional and business ethics and sanitation; or

(B) Obtain the approval of the board after the board performs a credentialing review, including but not limited to a review of the classes completed by the applicant and the applicant's professional experience, to determine the applicant's proficiency in the field of massage.

(e) Pass an examination prepared and conducted by the State Board of Massage Therapists or its authorized representative establishing the applicant's competency and ability to engage in the practice of massage. The examination must be administered in the English language or another language approved by the State Board of Massage Therapists and may be in written, oral or practical form and may test the applicant for the required level of knowledge and skill in any subject related to massage or bodywork. The State Board of Massage Therapists shall accept passage of the National Certification Board for Therapeutic Massage and Bodywork examination or another national standardized examination approved by the State Board of Massage Therapists as meeting the written examination requirement described in this paragraph.

(f) Submit the application with payment for licensing within one year after notification of having passed the qualifying examination.

(2) An applicant must be a person of good moral character. For purposes of this section, the lack of good moral character may be established by reference to acts or conduct reflecting moral turpitude or to acts or conduct that would cause a reasonable person to have substantial doubts about the applicant's ability to engage in the practice of massage in accordance with ORS 687.011 to 687.250, 687.895 and 687.991 and rules of the board.

(3) The board may require that an applicant furnish evidence satisfactory to the board that the applicant can safely and competently practice massage. The board may consider evidence including, but not limited to, indications of impairment as defined in ORS 676.303 or of behavior, practices or conduct that would be considered unprofessional or dishonorable conduct if engaged in by a person licensed under ORS 687.011 to 687.250, 687.895 and 687.991.

EXHIBIT 3

(4) The board shall adopt rules establishing the required hours for each subject listed in subsection (1)(d)(A) of this section.

(5) To be eligible for biennial renewal, a renewal applicant shall submit evidence to the board, as determined by the board by rule, that the applicant has completed a minimum of 12 hours of board-approved continuing education.

(6) To be eligible for inactive status, a licensed massage therapist may no longer be engaged in the practice of massage in this state. [1955 c.492 §4; 1957 c.166 §2; 1977 c.507 §7; 1979 c.89 §4; 1985 c.82 §4; 1989 c.841 §4; 1995 c.23 §1; 1997 c.32 §1; 1997 c.176 §1; 1997 c.626 §§6,6a; 1999 c.537 §9; 2009 c.536 §36; 2009 c.756 §62; 2011 c.44 §2; 2015 c.491 §2]

**687.055** [1977 c.507 §5; 1985 c.82 §6; repealed by 1989 c.841 §14]

**687.057 License by indorsement or reciprocity; rules.** (1) The State Board of Massage Therapists may license by indorsement or reciprocity any individual who applies, meets the requirements established by the board and, on the date of making application, is a massage therapist licensed under the laws of any other state or territory of the United States or by a foreign country if the requirements in the state, territory or country where the applicant is licensed are not less than those required in ORS 687.011 to 687.250, 687.895 and 687.991. The board shall adopt rules for determining the necessity of an examination based on educational preparation, successful completion of other examinations, work experience and the number of years in active practice of massage.

(2) The board may license by indorsement any individual who applies and successfully completes a practical examination if the individual is already licensed under a law of this state to do an act included in the definition of massage in ORS 687.011.

(3) The board may enter into an agreement with the appropriate regulatory body of any other state, territory or foreign country for reciprocal licensing if the board determines that the qualifications and standards of the other state, territory or foreign country are not less than those required in ORS 687.011 to 687.250, 687.895 and 687.991. [1977 c.507 §18; 1985 c.82 §7; 1989 c.841 §5; 1997 c.626 §7; 1999 c.326 §1; 1999 c.537 §10]

**687.059 Massage facilities; fees; rules.** (1) To be issued a permit to operate a massage facility in this state, an applicant must:

(a) Submit an application to the State Board of Massage Therapists in a form and manner prescribed by the board by rule;

(b) Comply with the health, safety and infection control requirements adopted by the board under ORS 687.121;

(c) Pay the fee required under ORS 687.071 (1)(b);

(d) If the applicant is a natural person, be at least 18 years of age; and

(e) If the applicant is not a natural person, comport with the laws of this state related to business formation, including making an appropriate filing with the Secretary of State.

(2) A massage facility for which a person has been issued a permit under this section may provide massage therapy only through the use of massage therapists licensed under ORS 687.051.

(3) The board may authorize relocating a massage facility if:

(a) The permittee submits an application in a form and manner prescribed by the board by rule;

(b) The permittee pays the fee required under ORS 687.071 (1)(h); and

(c) The permittee complies with any other applicable rule of the board.

(4) The board may authorize transferring a permit to operate a massage facility from one person to another person if the person to whom the permit will be transferred:

(a) Submits an application in a form and manner prescribed by the board by rule;

(b) Pays the fee required under ORS 687.071 (1)(i);

**EXHIBIT 3**/

(c) Makes all necessary changes to documents on file with the Secretary of State; and

(d) Complies with any other applicable rule of the board.

(5) The board may authorize transferring the name of a massage facility to another massage facility if the permittee who operates the massage facility to which the name will be transferred:

(a) Submits an application in a form and manner prescribed by the board by rule;

(b) Pays the fee required under ORS 687.071 (1)(j);

(c) Makes all necessary changes to documents on file with the Secretary of State; and

(d) Complies with any other applicable rule of the board. [2013 c.409 §4]

**687.060** [Repealed by 1955 c.492 §15]

**687.061 Expiration and renewal of license and permit; rules; fees; sanctions for practicing without valid license or operating without valid permit; penalty.** (1) Licenses issued under ORS 687.051 and permits issued under ORS 687.059 expire on the date established by the State Board of Massage Therapists by rule and may be renewed after payment of a renewal fee established by the board under ORS 687.071. If the renewal fee is not paid by the expiration date established by the board, a delinquency fee must be paid prior to renewal. Licenses and permits may be renewed within three years after the date of expiration upon payment of the renewal fee and the delinquency fee established by the board.

(2) An individual who engages in the practice of massage without holding a valid license issued under ORS 687.051 or a person who operates a massage facility without holding a valid permit issued under ORS 687.059 is subject to disciplinary action and civil penalty by the board, injunction and criminal prosecution. No disciplinary action, civil penalty or criminal proceeding shall be initiated under this section after the date that a renewal and delinquency fee is paid. However, payment of a renewal and delinquency fee does not stay any disciplinary action, civil penalty or criminal proceeding already assessed or initiated. [1955 c.492 §5; 1977 c.507 §8; 1979 c.89 §5; 1985 c.82 §8; 1989 c.841 §6; 1997 c.626 §8; 1999 c.537 §11; 2005 c.148 §1; 2013 c.409 §6]

**687.070** [Repealed by 1955 c.492 §15]

**687.071 Fees; rules; examinations; disposition and use of moneys.** (1) The State Board of Massage Therapists shall impose fees for the following:

(a) Issuance or renewal of a massage therapist license.

(b) Issuance or renewal of a permit to operate a massage facility.

(c) Examinations and reexaminations.

(d) Inactive status.

(e) Delinquency in renewal of a license or of a permit to operate a massage facility.

(f) Temporary practice permit.

(g) Application for massage license examination.

(h) Relocation of a massage facility as described in ORS 687.059 (3).

(i) Transferring a permit to operate a massage facility from one person to another person as described in ORS 687.059 (4).

(j) Transferring the name of a massage facility to another massage facility as described in ORS 687.059 (5).

(2) If the effective period of an initial massage therapist license or permit to operate a massage facility is to be less than 12 months by reason of the expiration date established by rule of the board, the required license fee shall be prorated to represent one-half of the rate for a biennial period.

(3) The board shall examine or reexamine an applicant for a massage therapist license who pays a fee for each examination and who meets the requirements of ORS 687.051.

EXHIBIT 3 -1

(4) All moneys received by the board shall be paid into the account created by the board under ORS 182.470 and are continuously appropriated to the board for the administration and enforcement of ORS 676.850, 687.011 to 687.250, 687.895 and 687.991. [1955 c.492 §6; 1957 c.166 §3; 1973 c.427 §32; 1977 c.217 §1; 1977 c.507 §9; 1979 c.89 §6; 1983 c.227 §1; 1989 c.841 §7; 1991 c.703 §30; 1993 c.18 §148; 1997 c.626 §9; 1999 c.326 §2; 1999 c.537 §12; 1999 c.1084 §14; 2005 c.148 §2; 2013 c.240 §15; 2013 c.409 §5]

**687.075** [1997 c.626 §1; 1999 c.537 §13; repealed by 2005 c.730 §77]

**687.080** [Repealed by 1955 c.492 §15]

**687.081 Grounds for denial, suspension or revocation of, or refusal to renew, license or permit; probation; penalties; complaint investigation.** (1) The State Board of Massage Therapists may discipline a person, deny, suspend, revoke or refuse to renew a license to practice massage or a permit to operate a massage facility and issue a reprimand to or censure or place on probation a licensee or permittee, if the person:

(a) Has violated a provision of ORS 687.011 to 687.250, 687.895 and 687.991 or any rule of the board adopted under ORS 687.121.

(b) Has made a false representation or statement to the board in order to induce or prevent action by the board.

(c) Is licensed under ORS 687.051 or holds a permit under ORS 687.059 and has a physical or mental condition that makes the licensee or permittee unable to conduct safely the practice of massage or operation of a massage facility.

(d) Is licensed under ORS 687.051 or holds a permit under ORS 687.059 and is habitually intemperate in the use of alcoholic beverages or is addicted to the use of habit-forming drugs or controlled substances.

(e) Has misrepresented to a patron services rendered.

(f) Has been convicted of a crime that bears a demonstrable relationship to the practice of massage or operation of a massage facility.

(g) Whether licensed to practice massage or applying for a license to practice massage, fails to meet a requirement under ORS 687.051.

(h) Whether permitted to operate a massage facility or applying for a permit to operate a massage facility, fails to meet a requirement under ORS 687.059.

(i) Violates a provision of ORS 167.002 to 167.027.

(j) Engages in unprofessional or dishonorable conduct.

(k) Has been the subject of disciplinary action as a massage therapist or operator of a massage facility by another state or territory of the United States or by a foreign country and the board determines that the cause of the disciplinary action would be a violation under ORS 687.011 to 687.250, 687.895 or 687.991 or the rules of the board if the cause of the disciplinary action had occurred in this state.

(2) If the board places a licensee or permittee on probation pursuant to subsection (1) of this section, the board may impose and at any time modify the following conditions of probation:

(a) Limitation on the scope of the practice of massage or the operation of a massage facility.

(b) Referral to the impaired health professional program established under ORS 676.190.

(c) Individual or peer supervision.

(d) Any other condition that the board considers necessary for the protection of the public or the rehabilitation of the licensee or permittee.

(3) If the board determines that the continued practice of massage by a licensee or the continued operation of a massage facility by a permittee constitutes a serious danger to the public, the board may

EXHIBIT 3 . /

impose an emergency suspension of the license or permit without a hearing. Simultaneous with the order of suspension, the board shall institute proceedings for a hearing as provided under ORS 687.011 to 687.250, 687.895 and 687.991. The suspension shall continue unless and until the licensee or permittee obtains injunctive relief from a court of competent jurisdiction or the board determines that the suspension is no longer necessary for the protection of the public.

(4) In addition to or instead of the discipline described in subsection (1) of this section, the board may impose a civil penalty under ORS 687.250. Civil penalties under this subsection shall be imposed pursuant to ORS 183.745.

(5) Prior to imposing a sanction authorized under this section, the board shall consider, but is not limited to considering, the following factors:

(a) The person's past history in observing the provisions of ORS 687.011 to 687.250, 687.895 and 687.991 and the rules of the board;

(b) The effect of the violation on public safety and welfare;

(c) The degree to which the action subject to sanction violates professional ethics and standards of practice;

(d) The economic and financial condition of the person subject to sanction; and

(e) Any mitigating factors that the board may choose to consider.

(6) In addition to the sanctions authorized by this section, the board may assess against a person the reasonable costs of a disciplinary action taken against the person.

(7) The board shall adopt a code of ethical standards for massage therapists and shall take appropriate measures to ensure that all applicants and massage therapists are aware of those standards.

(8) Upon receipt of a complaint under ORS 687.011 to 687.250, 687.895 and 687.991, the board shall conduct an investigation as described under ORS 676.165.

(9) Information that the board obtains as part of an investigation into the conduct of a person or as part of a contested case proceeding, consent order or stipulated agreement involving the conduct of a person is confidential as provided under ORS 676.175. [1955 c.492 §9; 1977 c.507 §10; 1979 c.89 §7; 1979 c.744 §58; 1985 c.82 §9; 1989 c.841 §8; 1997 c.627 §§1,1a; 1997 c.791 §42a; 1999 c.537 §14; 2009 c.697 §10; 2013 c.409 §7]

**687.086 License and permit denial procedure; review of rules and board orders.** (1) If the State Board of Massage Therapists proposes to impose any of the sanctions authorized in ORS 687.081 or take other disciplinary action, opportunity for hearing shall be accorded as provided in ORS chapter 183. Hearings under this section must be conducted by an administrative law judge assigned from the Office of Administrative Hearings established by ORS 183.605.

(2) Promulgation of rules, conduct of hearings, issuance of orders and judicial review of rules and orders shall be as provided in ORS chapter 183. [1971 c.734 §138; 1977 c.507 §11; 1997 c.626 §11; 1997 c.627 §2; 1999 c.537 §15; 1999 c.849 §§166,167; 1999 c.1084 §§15,15a; 2003 c.75 §59]

**687.087** [1989 c.841 §§9,12; 1991 c.734 §74; renumbered 687.895 in 1991]

**687.090** [Repealed by 1955 c.492 §15]

**687.091** [1955 c.492 §10; repealed by 1971 c.734 §21]

(Reporting Obligations)

**687.095 Duty to report prohibited conduct.** Unless state or federal laws relating to confidentiality or the protection of health information prohibit disclosure, a massage therapist who has reasonable

EXHIBIT 3. /

cause to believe that a licensee of another board has engaged in prohibited conduct as defined in ORS 676.150 shall report the prohibited conduct in the manner provided in ORS 676.150. [2009 c.536 §11]

**687.100** [Repealed by 1955 c.492 §15]

**687.101** [1955 c.492 §11; repealed by 1971 c.734 §21]

**687.110** [Repealed by 1955 c.492 §15]

**687.111** [1955 c.492 §8; 1977 c.507 §12; 1979 c.89 §8; 1981 c.398 §1; 1985 c.82 §10; repealed by 1989 c.841 §14]

(State Board)

**687.115 State Board of Massage Therapists; members; appointment; terms; meetings; compensation; administrator.** (1) The State Board of Massage Therapists operates as a semi-independent state agency subject to ORS 182.456 to 182.472, for purposes of carrying out the provisions of ORS 687.011 to 687.250, 687.895 and 687.991. The board consists of seven members appointed by the Governor and subject to confirmation by the Senate in the manner provided in ORS 171.562 and 171.565. All members of the board must be residents of this state. Of the members of the board:

(a) Four must be licensed massage therapists.

(b) Three must be members of the public, including one public member selected from a health related field. Public members may not be:

(A) Massage therapists; or

(B) A spouse, domestic partner, child, parent or sibling of a massage therapist.

(2)(a) Board members required to be licensed massage therapists may be selected by the Governor from a list of three to five nominees for each vacancy, submitted by a professional organization representing massage therapists.

(b) In selecting the members of the board, the Governor shall strive to balance the representation on the board according to:

(A) Geographic areas of this state; and

(B) Ethnic group.

(3)(a) The term of office of each member is four years, but a member serves at the pleasure of the Governor. The terms must be staggered so that no more than three terms end each year. A member is eligible for reappointment. If there is a vacancy in the membership of the board for any reason, the Governor shall make an appointment to become immediately effective for the remainder of the unexpired term.

(b) A board member shall be removed immediately from the board if, during the member's term, the member:

(A) Is not a resident of this state;

(B) Has been absent from three consecutive board meetings, unless at least one absence is excused; or

(C) Is not a licensed massage therapist or a retired massage therapist who was a licensed massage therapist in good standing at the time of retirement, if the board member was appointed to serve on the board as a massage therapist.

(4) Members of the board are entitled to compensation and expenses as provided in ORS 292.495. The board may provide by rule for compensation to board members for the performance of official duties at a rate that is greater than the rate provided in ORS 292.495.

**EXHIBIT 3** ﹅⟋

(5) The board may:

(a) Hold meetings at times and locations determined by the board.

(b) Hire, define the duties and fix the salary of an administrator who may hire and define the duties and provide supervision and evaluation of other employees as necessary to carry out the provisions of ORS 687.011 to 687.250, 687.895 and 687.991. The administrator, with approval of the board, may also employ special consultants. All salaries, compensation and expenses incurred or allowed shall be paid out of funds received by the board. [1971 c.650 §37; 1973 c.792 §42; 1977 c.217 §2; 1977 c.507 §13; 1985 c.82 §11; 1989 c.69 §2; 1997 c.177 §1; 1997 c.626 §12; 1997 c.632 §11; 1999 c.537 §16; 1999 c.1084 §16; 2009 c.535 §23; 2009 c.756 §64]

**687.120** [Repealed by 1955 c.492 §15]

**687.121 Rules.** The State Board of Massage Therapists may adopt rules:

(1) Establishing reasonable standards concerning the sanitary and hygienic conditions of, and public health and safety for, premises and facilities used by massage therapists.

(2) Establishing health, safety and infection control requirements for massage facilities.

(3) Relating to the methods and procedures used in the practice of massage.

(4) Governing the examination and investigation of applicants for a license under ORS 687.051 or a permit under ORS 687.059 and the issuance, renewal, suspension and revocation of such licenses and permits.

(5) Setting standards for certifying classes under ORS 687.051.

(6) Requiring that a massage therapist supply the board with the accurate, current address or addresses where the massage therapist engages in the practice of massage.

(7) Requiring that a person who holds a permit to operate a massage facility supply the board with the accurate, current address where the massage facility is located.

(8) Fixing the educational, training and experience requirements for licensing by indorsement or reciprocity.

(9) Establishing requirements for issuance and retention of an inactive massage therapist license or permit to operate a massage facility.

(10) Regarding any other matter that the board reasonably considers necessary and proper for the administration and enforcement of ORS 687.011 to 687.250, 687.895 and 687.991. [1955 c.492 §7; 1977 c.507 §14; 1985 c.82 §12; 1989 c.841 §13; 1997 c.626 §13; 1999 c.537 §17; 2013 c.409 §8]

**687.122 Investigation of violations; power of board; subpoenas.** (1) Upon the complaint of any citizen of this state, or upon its own motion, the State Board of Massage Therapists may investigate any alleged violation of ORS 687.011 to 687.250, 687.895 and 687.991.

(2) In the conduct of investigations, the board may:

(a) Take evidence;

(b) Take the depositions of witnesses, including the person charged, in the manner provided by law in civil cases;

(c) Compel the appearance of witnesses, including the person charged, before the board in person the same as in civil cases;

(d) Require answers to interrogatories; and

(e) Compel the production of books, papers, accounts, documents and testimony pertaining to the matter under investigation.

(3) In exercising its authority under subsection (2) of this section, the board may issue subpoenas over the signature of the board chairperson and the seal of the board in the name of the State of Oregon.

EXHIBIT 3, /

(4) If a person fails to comply with a subpoena issued under this section, the judge of the circuit court shall compel obedience by proceedings for contempt as in the case of disobedience of the requirements of a subpoena issued from the court. [1989 c.843 §8; 1997 c.626 §14; 1999 c.537 §18]

**687.123 Inspection of massage facilities and other premises.** Upon complaint about a massage facility or the premises on which a massage therapist practices massage, the State Board of Massage Therapists or its authorized representative may inspect the massage facility or premises in order to determine whether the massage facility or premises meet the standards set by order of the board under ORS 687.121 (1) or (2). [1989 c.841 §17; 1999 c.537 §19; 2013 c.409 §9]

**687.125** [1977 c.507 §17; 1997 c.626 §15; renumbered 687.890 in 1997]

**687.130** [Repealed by 1955 c.492 §15]

**687.135** [1977 c.507 §4; repealed by 1989 c.841 §14]

**687.140** [Repealed by 1955 c.492 §15]

**687.150** [Repealed by 1955 c.492 §15]

**687.160** [Repealed by 1955 c.492 §15]

**687.170** [Repealed by 1955 c.492 §15]

**687.180** [Repealed by 1955 c.492 §15]

**687.190** [Repealed by 1955 c.492 §15]

**687.200** [Repealed by 1955 c.492 §15]

**687.210** [Repealed by 1955 c.492 §15]

**687.220** [Repealed by 1955 c.492 §15]

**687.230** [Repealed by 1955 c.492 §15]

**687.240** [Repealed by 1955 c.492 §15]

**687.250 Enforcement; penalty.** (1) The State Board of Massage Therapists shall report to the proper district attorney all cases that in the judgment of the board warrant criminal prosecution under ORS 687.991.

(2) The board may, in its own name, assess a civil penalty against a person who violates a provision of ORS 687.011 to 687.250, 687.895 and 687.991. The board may assess the civil penalty instead of or in addition to disciplinary action under ORS 687.081, an injunction issued under ORS 687.021 or criminal prosecution by the district attorney under this section. The amount of the civil penalty may not exceed $1,000 for any single violation. Except as the board may otherwise provide under ORS 182.462 (1)(e), moneys collected through the assessment of civil penalties by the board under this subsection or ORS 687.081 shall be deposited into the account created by the board pursuant to ORS 182.470 and are

EXHIBIT 3.*i*

continuously appropriated to the board for carrying out the provisions of ORS 687.011 to 687.250, 687.895 and 687.991. [Formerly 687.890; 2011 c.110 §4; 2013 c.409 §10]

DIRECT ENTRY MIDWIVES

(Generally)

**687.405 "Direct entry midwifery" defined.** As used in ORS 687.405 to 687.495, "direct entry midwifery" means providing the following services for compensation:

(1) Supervision of the conduct of labor and childbirth;

(2) Providing advice to a parent as to the progress of childbirth;

(3) Rendering prenatal, intrapartum and postpartum care; and

(4) Making newborn assessments. [1993 c.362 §1; 2011 c.650 §4; 2013 c.657 §12]

**687.410 When use of title authorized.** A person may not use the title "licensed direct entry midwife," any abbreviation thereof or the initials "L.D.M." unless the person possesses an active license issued under ORS 687.405 to 687.495. [1993 c.362 §16; 2013 c.314 §25]

**687.415 Practice of direct entry midwifery without license prohibited; exceptions.** (1) Except as provided in subsection (2) of this section, a person may not practice direct entry midwifery in this state unless the person holds a license to practice direct entry midwifery under ORS 687.405 to 687.495.

(2) A person may practice direct entry midwifery in this state without a license to practice direct entry midwifery if:

(a) The person is a licensed health care practitioner and the services described in ORS 687.405 are within the scope of the person's license; or

(b)(A) The person is acting as a traditional midwife and does not use legend drugs or devices, the use of which requires a license under the laws of this state;

(B) The person does not advertise that the person is a midwife; and

(C) The person discloses to each client on a form adopted by the State Board of Direct Entry Midwifery by rule:

(i) That the person does not possess a professional license issued by the state;

(ii) That the person's education and qualification have not been reviewed by the state;

(iii) That the person is not authorized to carry and administer potentially life saving medications;

(iv) That the risk of harm or death to a mother or newborn may increase as a result of the information described in sub-subparagraphs (i) and (ii) of this subparagraph;

(v) A plan for transporting the client to the nearest hospital, as defined in ORS 442.015, if a problem arises during labor or childbirth;

(vi) That the client will not have recourse through a complaint process; and

(vii) The types of midwives who are licensed by the state.

(3) If supervised by a person licensed to practice direct entry midwifery, a student midwife, birth assistant or other individual may assist the direct entry midwife in the provision of services described in ORS 687.405.

(4) A license to practice direct entry midwifery under ORS 687.405 to 687.495 is required for purposes of reimbursement under medical assistance programs. [1993 c.362 §11; 2013 c.657 §1]

(Licensing)

**EXHIBIT 3.** *l*

**687.420 Standards for licensing; application; payment by medical assistance program for services provided by licensed midwife.** (1) The State Board of Direct Entry Midwifery shall establish standards for qualifications for the licensure of direct entry midwives. Such standards shall:

(a) Be consistent with the requirements for becoming a certified professional midwife as established by the North American Registry of Midwives;

(b) Require the applicant to hold a Certified Professional Midwife credential established by the North American Registry of Midwives;

(c) Require the applicant to successfully complete an examination approved by the board;

(d) Require the applicant to be certified in cardiopulmonary resuscitation for infants and adults;

(e) Require the applicant to submit a written plan for emergency transport of prospective patients;

(f) Require the applicant to hold a high school diploma or a modified diploma or to successfully pass a high school equivalency course; and

(g) Require that the applicant participate in at a minimum:

(A) 25 assisted deliveries;

(B) 25 deliveries for which the applicant was the primary care provider;

(C) 100 prenatal care visits;

(D) 25 newborn examinations; and

(E) 40 postnatal examinations.

(2) A person who desires to become licensed as a direct entry midwife shall submit an application to the Health Licensing Office stating the applicant's qualifications for licensure. If the applicant meets the standards established under subsection (1) of this section and the applicant is not disqualified from licensure under ORS 676.612, the office shall issue an annual license to the direct entry midwife. The office shall impose the applicable fees for application, licensure and examination established under ORS 676.576.

(3) A direct entry midwife licensed under this section is entitled to payment under the rules of the medical assistance program for services provided to an eligible recipient of medical assistance. [1993 c.362 §3; 1997 c.690 §5; 2001 c.53 §1; 2003 c.547 §20; 2005 c.648 §33; 2013 c.314 §26; 2013 c.568 §53; 2013 c.657 §2; 2017 c.726 §14]

**687.425 Renewal of license; effect of failure to renew.** (1) The Health Licensing Office shall renew a direct entry midwife license upon:

(a) The applicant's satisfaction of the requirements for renewal under ORS 676.572;

(b) Receipt of proof of current cardiopulmonary resuscitation certification for infants and adults;

(c) Receipt of the applicable renewal fee established under ORS 676.576; and

(d) The applicant's satisfaction of the requirements for renewal prescribed by the State Board of Direct Entry Midwifery under subsections (2) and (3) of this section.

(2) The board shall prescribe requirements for license renewal including, but not limited to, continuing education that must include training in use of legend drugs and devices.

(3) The board shall require a midwife who has attended fewer than five births in the previous year to take an additional 10 hours of continuing education as prescribed by the board. [1993 c.362 §9; 2001 c.53 §5; 2001 c.274 §3; 2001 c.462 §4; 2003 c.547 §21; 2005 c.648 §34; 2009 c.701 §21; 2013 c.314 §27; 2013 c.568 §54]

**687.430 Waiver of required written examination.** A person licensed to practice direct entry midwifery under the laws of another state who demonstrates to the satisfaction of the Health Licensing Office that the person has passed a written examination at least equal to the written examination required of persons eligible for licensure under ORS 687.405 to 687.495 may have the written examination waived pursuant to standards of the State Board of Direct Entry Midwifery. [1993 c.362 §4; 2001 c.53 §2; 2005 c.648 §35; 2013 c.568 §55]

EXHIBIT 3.

**687.435** [1997 c.690 §4; 1999 c.885 §25; 1999 c.990 §3; 2003 c.547 §22; 2005 c.648 §36; 2009 c.701 §22; repealed by 2013 c.314 §65]

**687.440** [1993 c.362 §19; 1999 c.885 §24; repealed by 2005 c.648 §121]

**687.445 Discipline.** In the manner prescribed in ORS chapter 183 for contested cases and in consultation with the Health Licensing Office, the State Board of Direct Entry Midwifery may impose a form of discipline specified in ORS 676.612 and 676.992 (1) and (2) against any person practicing direct entry midwifery for any of the grounds listed in ORS 676.612 and for any violation of the provisions of ORS 687.405 to 687.495 or the rules adopted under ORS 687.405 to 687.495. [2003 c.547 §28; 2005 c.648 §37; 2013 c.568 §57; 2013 c.657 §11]

**687.450** [1993 c.362 §10; 2001 c.53 §6; repealed by 2003 c.547 §118]

**687.455** [1993 c.362 §5; 2001 c.53 §3; 2003 c.547 §24; repealed by 2005 c.648 §121]

(Reporting Obligations)

**687.460 Duty to report prohibited conduct.** Unless state or federal laws relating to confidentiality or the protection of health information prohibit disclosure, a licensed direct entry midwife who has reasonable cause to believe that a licensee of another board has engaged in prohibited conduct as defined in ORS 676.150 shall report the prohibited conduct in the manner provided in ORS 676.150. [2009 c.536 §28]

(State Board and Health Licensing Office)

**687.470 State Board of Direct Entry Midwifery; establishment; appointment; confirmation; membership; compensation and expenses.** (1) There is established within the Health Licensing Office the State Board of Direct Entry Midwifery. The board consists of seven members appointed by the Governor and subject to confirmation by the Senate in the manner provided in ORS 171.562 and 171.565. All members of the board must be residents of this state. Of the members of the board:

(a) Four must be licensed direct entry midwives.

(b) One must be a certified nurse midwife.

(c) One must be a physician licensed under ORS chapter 677 involved at the time of appointment in obstetrical care or education.

(d) One must be a member of the public.

(2)(a) Board members required to be licensed direct entry midwives may be selected by the Governor from a list of three to five nominees for each vacancy, submitted by a professional organization representing direct entry midwives.

(b) In selecting the members of the board, the Governor shall strive to balance the representation on the board according to:

(A) Geographic areas of this state; and

(B) Ethnic group.

(3)(a) The term of office of each member is three years, but a member serves at the pleasure of the Governor. The terms must be staggered so that no more than three terms end each year. Vacancies shall be filled by the Governor by appointment for the unexpired term. A member shall hold the member's office until the appointment and qualification of a successor. A member is eligible for reappointment. If

a person serves two consecutive full terms, a period of at least three years must elapse before the person is again eligible for appointment to serve on the board.

(b) A board member shall be removed immediately from the board if, during the member's term, the member:

(A) Is not a resident of this state;

(B) Has been absent from three consecutive board meetings, unless at least one absence is excused; or

(C) Is not a licensed direct entry midwife or a retired direct entry midwife who was a licensed direct entry midwife in good standing at the time of retirement, if the board member was appointed to serve on the board as a direct entry midwife.

(4) Members of the board are entitled to compensation and expenses as provided in ORS 292.495. The office may provide by rule for compensation to board members for the performance of official duties at a rate that is greater than the rate provided in ORS 292.495. [1993 c.362 §2; 1999 c.885 §23; 1999 c.990 §1; 2005 c.648 §38; 2009 c.535 §24; 2009 c.701 §23a; 2011 c.650 §6; 2013 c.568 §58]

**687.475 Officers; meetings; quorum; rules.** The State Board of Direct Entry Midwifery shall elect a chairperson. The board shall adopt rules to govern the proceedings of the board. The board shall hold meetings at such times and places as it determines. A majority of the members of the board shall constitute a quorum. [1993 c.362 §6; 2009 c.535 §25]

**687.480 Rules; practice standards.** (1) The State Board of Direct Entry Midwifery shall adopt rules for the administration of ORS 687.405 to 687.495.

(2) The board shall adopt practice standards that include:

(a) Maintenance of records of care, including patient charts;

(b) Participation in peer review;

(c) Development of a written plan for emergency transport of patients;

(d) Guidelines for equipment; and

(e) Maintenance of patient disclosure forms, which must include information regarding whether the midwife has malpractice insurance. [1993 c.362 §8; 2001 c.53 §4a; 2013 c.657 §3]

**687.482 Peer review.** (1) Peer review of a licensed direct entry midwife conducted under ORS 687.480 is subject to the provisions of ORS 41.675. Charts and records created during or for the purpose of the practice of direct entry midwifery are not data under ORS 41.675.

(2) Peer review that is conducted outside of the Health Licensing Office may not be used to replace office regulatory investigations of complaints against licensed direct entry midwives. [2011 c.650 §2; 2013 c.568 §59]

**687.485 Authority of Health Licensing Office; rules.** In addition to the powers otherwise granted by ORS 687.405 to 687.495, the Health Licensing Office, in consultation with the State Board of Direct Entry Midwifery, may:

(1) Determine whether applicants meet the qualifications under ORS 687.405 to 687.495 and grant licenses to qualified applicants upon compliance with the rules of the board;

(2) Do any act necessary or proper to effect and carry out the duties required of the office by ORS 687.405 to 687.495; and

(3) Accept and expend donations, contributions and grant funds for the purposes of ORS 687.405 to 687.495. [1993 c.362 §7; 1999 c.990 §2; 2001 c.53 §4; 2001 c.462 §3; 2003 c.547 §25; 2005 c.648 §39; 2013 c.568 §60; 2013 c.657 §4]

EXHIBIT 3./

**687.490 Protection for person providing information to board or office.** A person who in good faith provides information to the State Board of Direct Entry Midwifery or the Health Licensing Office for purposes related to an investigation conducted under ORS 676.560 to 676.625, if the investigation is related to the regulation of direct entry midwifery, or ORS 687.405 to 687.495 is not subject to an action for civil damages as a result of providing the information. [1993 c.362 §17; 2001 c.53 §7; 2003 c.547 §26; 2005 c.648 §40; 2013 c.568 §61; 2017 c.101 §7]

(Miscellaneous)

**687.493 Authority to purchase and administer certain legend drugs and devices.** (1) A direct entry midwife licensed under ORS 687.405 to 687.495 may purchase and administer authorized scheduled legend drugs and devices that are used in pregnancy, birth, postpartum care, newborn care or resuscitation and that are deemed integral to providing safe care to the public by the State Board of Direct Entry Midwifery by rule.

(2) Legend drugs authorized under subsection (1) of this section are limited:

(a) For neonatal use to prophylactic ophthalmic medications, vitamin K and oxygen; and

(b) For maternal use to antibiotics for Group B Streptococcal antibiotic prophylaxis, postpartum antihemorrhagics, $Rh_o(D)$ immune globulin, epinephrine, intravenous fluids, local anesthetic and oxygen.

(3) Legend devices authorized under subsection (1) of this section are limited to devices for injection of medications, for the administration of intravenous fluids, for adult and infant resuscitation and for rupturing the amniotic membranes.

(4) A pharmacist who dispenses drugs and devices to a licensed midwife as authorized by this section and in conformity with the provisions of ORS chapter 689 is not liable for any adverse reactions caused by administration of the legend drugs and devices by the midwife. [2001 c.462 §2; 2013 c.657 §13]

**687.495 Collection of data on birth and fetal death outcomes.** (1) The Center for Health Statistics established under ORS 432.010 shall collect and report data on birth and fetal death outcomes occurring in this state, including intrapartum and neonatal transfers to hospital care from another birthing facility, hospital or other location. The center shall report the data by attendant type. The report shall distinguish outcomes between licensed direct entry midwives and direct entry midwives who are not licensed under ORS 687.405 to 687.495.

(2) The Oregon Health Authority may accept gifts, grants and contributions from any public or private source for the purpose of carrying out the provisions of this section. [1993 c.362 §15; 2005 c.648 §41; 2011 c.650 §5]

**687.890** [Formerly 687.125; 1999 c.537 §20; 1999 c.1084 §17; renumbered 687.250 in 2001]

PENALTIES

**687.895 Procedure for civil penalties.** Any civil penalty under ORS 687.011 to 687.250, 687.895 and 687.991 shall be imposed as provided in ORS 183.745. [Formerly 687.087; 1997 c.626 §16]

**687.990** [Repealed by 1955 c.492 §15]

**687.991 Criminal penalties.** (1) Violation of ORS 687.021 or of any rule adopted under ORS 687.121 is a Class A misdemeanor.

EXHIBIT 3.*1*

# EXHIBIT 4.O

RESEARCH HIGHLIGHTS

# Noninvasive brain wave treatment reduces Alzheimer's pathology, improves memory in mice

June 27, 2019

Alzheimer's Disease  Neuroscience

Recent NIA-supported research offers evidence in mice that stimulation of gamma brain waves reduces Alzheimer's-related proteins and slows neurodegeneration associated with the disease.

Healthy brains feature rhythmic patterns, or brain waves, that operate at different frequencies. Gamma brain waves, which oscillate at roughly 30 to 100 Hz, are associated with higher-order cognitive functions and are known to decrease in the brains of people with Alzheimer's.

Previously, researchers at the Massachusetts Institute of Technology (MIT) discovered that exposing Alzheimer's mouse models to LED lights flickering at 40 Hz could stimulate gamma waves, which not only reduced levels of beta-amyloid and tau—proteins associated with Alzheimer's—but also boosted the activity of microglia in clearing harmful debris.



In a study reported in *Cell* April 4, MIT researchers further explored the effects of gamma wave stimulation using sound in Alzheimer's mouse models. Clicks played at 40 Hz an hour a day for a week reduced levels of beta-amyloid in the auditory cortex and nearby hippocampus, a part of the brain responsible for learning and memory. Stimulated mice performed better on memory tasks, including recognizing objects and

*Credit: The Picower Institute for Learning and Memory*

navigating a water maze to find a hidden platform. Researchers also saw changes in activation responses in microglia and astrocytes, cells involved in clearing debris, and in blood vessels.

EXHIBIT 4.0



# NATIONAL CANCER INSTITUTE

# Aromatherapy With Essential Oils (PDQ®)–Patient Version

Go to Health Professional Version

## Overview

- Aromatherapy is the use of essential oils from plants (flowers, herbs, or trees) as therapy to improve physical, mental, and spiritual well-being (see Question 1).

- Aromatherapy may be used with other complementary treatments, such as massage or acupuncture, as well as with standard medical treatments to manage symptoms caused by cancer or cancer treatment (see Question 1).

- Essential oils are most often used by inhaling them or by applying a diluted form of them to the skin (see Question 2).

- Aromatherapy research with cancer patients has studied the effect of essential oils on anxiety, nausea, vomiting, and other health-related conditions (see Question 4).

- Safety testing on essential oils has found very few side effects. Lavender and tea tree essential oils have been found to have some hormone-like effects (see Question 5).

- Aromatherapy products do not need approval by the U.S. Food and Drug Administration (FDA) (see Question 6).

## Questions and Answers About Aromatherapy

### 1. What is aromatherapy?

Aromatherapy is the use of essential oils from plants to improve the mind, body, and spirit. It is used by patients with cancer to improve quality of life and reduce stress, anxiety, pain, nausea, and vomiting caused by cancer and its treatment. Aromatherapy is often used with other complementary treatments like massage therapy and acupuncture, as well as with standard medical treatments, for symptom management.

Essential oils are the fragrant (aromatic) part found in many plants, often under the surface of leaves, bark, or peel. The fragrance is released if the plant is crushed or a special steam process is used.

There are many essential oils used in aromatherapy, including those from Roman chamomile, geranium, lavender, tea tree, lemon, ginger, cedarwood, and bergamot. Each plant's essential oil has a different chemical make-up that affects how it smells, how it is absorbed, and how it affects the body.

Essential oils are very concentrated. For example, it takes about 220 pounds of lavender flowers to make about 1 pound of essential oil. The aroma of essential oils fades away quickly when left open to air.

EXHIBIT 4.1



The chemical compounds in essential oils can change as they get older. Many essential oils do not have an expiration date.

## 2. How is aromatherapy given or taken?

Aromatherapy is used in several ways.

- **Indirect inhalation:** The patient breathes in an essential oil by using a room diffuser, which spreads the essential oil through the air, or by placing drops on a tissue or piece of cotton nearby.
- **Direct inhalation:** The patient breathes in an essential oil by using an individual inhaler made by floating essential oil drops on top of hot water.
- **Massage:** In aromatherapy massage, one or more essential oils is diluted into a carrier oil and massaged into the skin.

Essential oils may also be mixed with bath salts and lotions or applied to bandages.

There are some essential oils used to treat specific conditions. However, the types of essential oils used and the ways they are combined vary, depending on the experience and training of the aromatherapist.

## 3. Have any preclinical (laboratory or animal) studies been done using aromatherapy?

In laboratory studies, tumor cells are used to test a substance to find out if it is likely to have any anticancer effects. In animal studies, tests are done to see if a drug, procedure, or treatment is safe and effective in animals. Laboratory and animal studies are done before a substance is tested in people.

Laboratory and animal studies have tested the effects of essential oils. For information on laboratory and animal studies done using essential oils, see the Laboratory/Animal/Preclinical Studies section of the health professional version of Aromatherapy With Essential Oils.

## 4. Have any clinical trials (research studies with people) of aromatherapy been done?

Clinical trials of aromatherapy have studied its use in the treatment of anxiety, nausea, vomiting, and other health-related conditions in cancer patients. No studies of aromatherapy used to treat cancer have been published in a peer-reviewed scientific journal.

Studies of aromatherapy have shown mixed results. There have been some reports of improved mood, anxiety, sleep, nausea, and pain. Other studies reported that aromatherapy showed no change in symptoms.

### Studies on anxiety and depression

- A trial of 103 cancer patients studied the effects of massage compared to massage with Roman chamomile essential oil. Two weeks later, a decrease in anxiety and improved symptoms were noted in the group that had massage with essential oil. The group that had massage only did not have the same benefit.
- Another study of 58 patients with various cancers who completed six aromatherapy sessions showed a decrease in anxiety and depression compared with before the sessions began.

EXHIBIT 4.1

# EXHIBIT 4.1

 **Cleveland Clinic**

# LED Light Therapy

LED (light-emitting diode) light therapy treats various skin conditions and concerns, such as acne, fine lines and psoriasis. It comes in different types, including red light LED therapy and blue light LED therapy, which are sometimes used in combination.

**Procedure Details**   **Risks / Benefits**   **Recovery and Outlook**

**When to Call the Doctor**

## OVERVIEW

## What is LED light therapy?

LED (light-emitting diode) light therapy is a non-invasive treatment that enters the skin's layers to improve the skin.

In the 1990s, NASA began studying LED's effects in promoting wound healing in astronauts by helping cells and tissues grow.

Ad

EXHIBIT 4.3

Today, dermatologists and estheticians commonly use LED light therapy to treat a range of skin issues. Skin specialists often use LED light therapy together with other treatments, such as creams, ointments and facials, to give you the best results.

You can also buy an array of at-home devices that use LED light therapy, including LED masks.

ADVERTISEMENT

Cleveland Clinic is a non-profit academic medical center. Advertising on our site helps support our mission. We do not endorse non-Cleveland Clinic products or services. Policy

## What does LED light therapy do?

LED light therapy helps treat a variety of skin concerns and conditions, including:

- Eczema.
- Hair loss.
- Mild to moderate acne.
- Psoriasis.
- Rough, scaly, precancerous spots on the skin (actinic keratosis).
- Rosacea.
- Sun damage.
- Wounds.
- Wrinkles.

Ad

EXHIBIT 4.3

# EXHIBIT 4.2



Published in StartUp Health



StartUp Health   (Follow)

Sep 16, 2019 · 5 min read · Listen

□⁺ Save    🐦    🌐    in    🔗

# Better Health Through All Five Senses

Meet eight entrepreneurs connecting the dots between our sensory health and our wellbeing.

EXHIBIT 4.3

⌂             🔍

# EXHIBIT 4.3



T he five senses give us the tools to perceive the world around us, but they also provide a window onto our health. Doctors can get a glimpse of what's going on inside the human body simply by looking at a patient's eyes, mouth, ears, and nose, and by paying careful attention to the skin, our bodies' largest organ.

New and emerging research illuminates the links between our sensory organs and systems and our overall health. Periodontal gum disease has been correlated with illnesses such as heart disease, diabetes, sexual dysfunction and stroke, although the connections between these diverse issues is not yet fully understood. Disorders of the

**EXHIBIT 4.3**


and appearance can indicate anything from food sensitivity to hormonal imbalance to autoimmune disease.

The founders of the six companies below are taking a closer look at the mouth, nose and skin to improve the systemic functioning of the human body. As research progresses, their insights will pay ever greater dividends into patients' everyday health and happiness.   👏 67  |  ○

**Brant Herman and Bob Bellhouse**
Founder & CEO and COO, MouthWatch

MouthWatch is on a mission to develop dental products and telehealth solutions that increase access to care, boost practice revenue and improve the dental patient experience. Across the US, dental practice revenue is stagnant or declining as patients are visiting the dentist less often, spending less on the high out-of-pocket expense of dental care and shifting toward large group practices that reduce fees via reduced overhead. According to the American Dental Association, "59% of adults indicated that they forgo dental care due to cost...and 19% because they cannot find a convenient location or appointment."

MouthWatch is a teledentistry solution that improves oral health, extends care to patients with limited access and boosts treatment understanding and acceptance. In addition to intraoral cameras, MouthWatch offers TeleDent®, a HIPAA compliant proprietary teledentistry platform characterized by ease of implementation and ease of use. TeleDent® enables secure visual communication between patient and provider, including peer-to-peer coordination between dental care providers, specialists and medical doctors. MouthWatch products are used in 10,000 US operatories, with 14,000 cameras sold in 50 states and 34 countries via direct sales and distributors. The company's notable partnerships include Columbia University Dental, NYU Dental and 30 other pilot programs

**EXHIBIT 4.3**

⌂     ○     

# EXHIBIT 4.4

SCIENCE

# How to hear the world through your back

Mar 17, 2015 / Helen Walters



"We're interested in how we can feed information to the brain via unusual sensory channels," says David Eagleman, as he leans back in his chair and sips his cup of tea. The neuroscientist and author is discussing the project he's currently working on with his grad student, Scott Novich, the "versatile extra-sensory transducer," or, you know, "V.E.S.T." But this isn't any old vest. It's a vest installed with tiny motors that can convert sound and noise into vibrations on the back, allowing deaf people to hear the world through their chest.

It might sound radical, but to Eagleman, it presents a fairly obvious, exciting possibility. "If this works well, and it looks quite promising, we can build it for 40 times more cheaply than a cochlear implant," he says. "And ours doesn't require an invasive surgery."

EXHIBIT 4.4

So how does it work? By playing on the brain's aptitude for assigning meaning to patterns, it converts sound frequencies into vibrations via a mobile phone and a smart piece of computational design. And while it's still early days, Eagleman is optimistic that someone might learn to hear through the vest within about three months. "Our expectation is that by then someone will not only be able to understand everything but will have a direct perceptual experience equivalent to hearing, but through the torso," he says. "It sounds crazy that you could ever see through your tongue or hear through your torso, but that's all vision or hearing ever is. It's just electrical signals in the brain; the brain doesn't care how it gets them."



*Attendees get a hands-on look at David Eagleman's vest at TED2015. Photo by James Duncan Davidson/TED.*

Eagleman isn't limiting his ambitions for the vest to deaf people, for substituting senses; he's also interested in what he calls *sensory addition*, or adding entirely new senses to the human experience. For instance, what if we could stream realtime data from the stock market to allow someone to make subconscious buy or sell decisions, to have what he calls a "direct perceptual experience of the economic movements on the planet?" Or what if a pilot could understand the measurements of a plane by feeling them, not merely by looking at them. "Have you *seen* the cockpits of modern aircraft?" he asks. "They're completely overwhelming! Imagine if you could feel the whole state of an aircraft in an unconscious manner." Move over data visualization. Here's the era of data sensing.      EXHIBIT 4.4

# EXHIBIT 5.0

C DAVIS - BWC - 07.01.2021 0424 AM

# EXHIBIT 5.1



C DAVIS - BWC - 07.01.2021 0424 AM

# EXHIBIT 5.2



Power Off

Press: Move
Press & Hold: Select

Plaintiff Exhibit
#_62_
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 5.3



Plaintiff Exhibit
#67
Date 09/12/2022

Case # 6:22-CV-01361-A

# EXHIBIT 6



Exhibit 6



## DESCHUTES COUNTY SHERIFF'S OFFICE
**CASE REPORT**
63333 West Highway 20
Bend, OR 97701

CASE# **2021-00035317**

---

### NARRATIVE (Continuation)

Nela was now starting to feel very uncomfortable and made up an excuse to leave. Nela got up from the table, got dressed, left and walked across the street to Snow Cap. Nela had Joel go back to the spa and pay Boyle somewhere between $75 - $120.

I ended our interview with Nela and deactivated my body worn camera. Nela's recorded interview was automatically uploaded into evidence.

During my investigation I had obtained a search warrant to search Hop In the Spa for various items. During our search of the building on 06/30/2021, I had discovered a hole about the size of a US nickel in the drywall on the stairway leading up to the second floor. I discovered the hole hidden underneath a piece of thick black paper stock taped to the drywall. The top of the card stock was taped to the wall, the bottom of the card stock was not. When I lifted the card stock and I looked through the hole, I could clearly see the right tub in the soaking room. I walked into the soaking room and saw the other side of the hole slightly above a towel rack affixed to the wall. I know based on my training a hole such as this is commonly known as a "Peep" or "Viewing" hole.

Each woman listed above in this report who had received a massage form Boyle also had soaked in the right tub and were instructed to do so by Boyle. Any person soaking in the right tub would have clearly been visible to someone on the stairway looking through the hole and the person in the tub would probably not have known. Additionally, I have interviewed several other women during my investigation and all have indicated Boyle had instructed them to sit/lay and/or use the right tub. Most of these women were in a state of nudity as they believed the soaking room was a private area.

My investigation into Boyle has lead me to develop a profile of a woman Boyle is attracted to and gravitates towards. The women I have interviewed seem to fall within these parameters with only very few exceptions:

- Age range = early 20's to mid 40's
- Hair Color = Blonde (light, dark, or dyed)
- Body shape = Athletic to Voluptuous
- Breast size = B cups to DD cups

Each woman listed in this case report fall into this profile as does the other women I have interviewed in my other reports listed at the top of this report, again with very few exceptions.

---

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| Hudson, Michael 10L46 | 08/04/2021 | Davis, Chad Everett  08/05/2021  12:23 |

# EXHIBIT 7

# 000 Case Report



**DESCHUTES COUNTY SHERIFF'S OFFICE**    CASE# **2020-00105987**

**CASE REPORT**    CONNECTED # 1
63333 West Highway 20    CONNECTED # 2
Bend, OR 97701    CONNECTED # 3

| | | | |
|---|---|---|---|
| **EVENT** | REPORTED DATE/TIME **09/29/2020  15:36** | OCCURRED-IN-ODDIT TYPE **Harassment** | |
| | OCCURRED FROM DATE/TIME **06/08/2020  08:00** | OCCURRED THRU DATE/TIME **06/08/2020  23:00** | LOCATION OF OCCURRENCE **371 W CASCADE AVE** **SISTERS** |

### DISTRIBUTION

| | | | |
|---|---|---|---|
| ☐ KARLY's LAW | ☐ DA | ☐ DHS | ☐ JUSTICE COURT |
| ☐ MDT | ☐ JUVENILE | ☐ KIDS CENTER | ☐ CIRCUIT COURT |
| ☐ USE of FORCE | ☐ DMV | ☒ DETECTIVES | ☐ MENTAL HEALTH |
| ☐ PURSUIT | ☐ OLCC | ☐ ME | ☐ ENVIRONMENTAL HEALTH |
| ☐ K-9 | Other: | | |

| | CTS | STATUTE/DESCRIPTION | ATTEMPT/COMMIT |
|---|---|---|---|
| **OFFENSES** | 2 | **163.700** **Invasion of Personal Privacy 2nd Deg** | **Committed** |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| **SUBJECT** | SUBJECT TYPE **1 Victim** | NAME (LAST, FIRST, MIDDLE SUFFIX) **Contreras, Toni** | |

| | | | |
|---|---|---|---|
| **SUBJECT** | SUBJECT TYPE **2 Suspect** | NAME (LAST, FIRST, MIDDLE SUFFIX) **BOYLE, MICHAEL PATRICK** | PRIMARY PHONE |
| | ADDRESS (STREET, CITY, STATE, ZIP) **66932 Sagebrush LN** **Bend, OR 97703-** | | PHONE # |
| | DOB    AGE or AGE RANGE    SEX    RACE | HEIGHT or WEIGHT    WEIGHT or RANGE    HAIR | EYE |

| | | | |
|---|---|---|---|
| **SUBJECT** | SUBJECT TYPE **Mentioned** | NAME (LAST, FIRST, MIDDLE SUFFIX) **Hop In The Spa,** | |

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Crosswhite, Brent 10L75** | **10/06/2020** | **Davis, Chad Everett  10/07/2020 01:33** |

DCSO Case Report 2020-00105987 Page 1 OF 4

**EXHIBIT 7.0**189



# DESCHUTES COUNTY SHERIFF'S OFFICE
## CASE REPORT
63333 West Highway 20
Bend, OR 97701

CASE# **2020-00105987**

| ADDITIONAL SUBJECTS |
|---|

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | PRIMARY VICTIM |
|---|---|---|
| **1 Victim** | **Contreras-Arroyo, Adrian** | |

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | PRIMARY VICTIM |
|---|---|---|
| | | |

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | |
|---|---|---|
| | | |

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | |
|---|---|---|
| | | |

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Crosswhite, Brent 10L75** | **10/06/2020** | **Davis, Chad Everett  10/07/2020  01:33** |

EXHIBIT 7.0



# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE REPORT**
63333 West Highway 20
Bend, OR 97701

CASE# **2020-00105987**

## NARRATIVE

Written by: Deputy Brent Crosswhite
Date: 10/06/2020

ATTACHMENTS:

1. Email from Toni Contreras (1 page)
2. Info from Internet / Website ( 3 pages)
3. Photo from Toni Contreras (1 page)
4. Zoomed-in Photo from Contreras (1 page)

NARRATIVE:

On 09/29/2020, I was dispatched to contact Toni Contreras by phone at &#9608;&#9608;&#9608;&#9608;&#9608; regarding a harassment issue at Hop in the Spa, 371 W Cascade Avenue, Sisters, Oregon.

Upon contact Contreras told me that on 06/08/2020, she and her husband, Adrian Contreras-Arroyo, were visiting Sisters, Oregon from their home in Florida. While in town the arranged to spend some time at a local business, Hop in the Spa. She said they made an appointment with Michael Boyle, who represented himself as the owner of the business.

Contreras said she and her husband opted for the tub experience. She described this room as being the only room in the business that housed soaking tubs. Contreras said she and her husband used the soaking tubs and in doing so were fully nude. She said they took multiple photographs while inside the soaking tub room.

Contreras said they have just recently reviewed the photographs from this trip. While reviewing the photographs they noticed the mirror on the back room of the soaking tub room appears to be two way glass, not actually a mirror. Contreras said they used a polarizer filter on one camera and low light settings on another camera. She said in the photographs it appears that there was a piece of cardboard behind the glass that was removed during the time they were inside the room, allowing the room to be viewed from behind the glass.

Contreras said that when you are actually present in the room, the window appears to be a normal mirror.

Contreras said that her concern is that someone was present behind the glass and watching them or even possibly recording images of them. Contreras said they did not see any other employees at the spa during their visit, only Michael Boyle.

Contreras said she could send me some of the photographs they had taken inside the soaking room. She advised that she would block out parts of the photographs to cover areas in which she was unclothed.

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Crosswhite, Brent 10L75** | **10/06/2020** | **Davis, Chad Everett  10/07/2020  01:33** |

DCSO Case Report 2020-00105987 Page 3 OF 4

EXHIBIT 790



# DESCHUTES COUNTY SHERIFF'S OFFICE
## CASE REPORT
63333 West Highway 20
Bend, OR 97701

CASE# **2020-00105987**

### NARRATIVE (Continuation)

On 09/29/2020, I received the attached email from Contreras containing a link to a Google Drive folder which contained several photographs of the inside of the soaking room at Hop in the Spa. On the back wall of the room there is a long rectangular shaped window / mirror. The window / mirror is covered with a sheer fabric covering that hangs down in the right-hand upper corner. It is in the right-hand upper corner that it appears that something, possibly cardboard is present and then removed. The background in this corner appears to turn from brownish to black.

FOLLOW UP NEEDED:

I contacted Detective Lt. Chad Davis and advised him of this complaint. He authorized the intitial report be forwarded to him for follow up by the detective division.

Case open / active pending further investigation.

End of report.

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Crosswhite, Brent 10L75** | **10/06/2020** | **Davis, Chad Everett 10/07/2020 01:33** |

## 000a Email from Contreras

9/30/2020                                    Untitled - Brent Crosswhite

# Untitled

Toni Contreras 

Brent Crosswhite <Brent.Crosswhite@deschutes.org>;

'EXTERNAL EMAIL.

Good evening, I attached a link to a google drive. I could not send photos as the file was too big.
When you are in the room the area behind the bottle looks like it is a mirror when you look in our photos it is clearly not. We were using a polarizer filter on one of our cameras and low light settings on the other. Which is why I think in our photos it shows that it is not an actual mirror

We do have more photos but some are a bit inappropriate to share unless you think you really need them. However I think you can see enough in these pictures attached for you to see that it is clearly not a mirror and someone was opening whatever was blocking it. It looks like cardboard. In some of the pictures you will see it is bending like cardboard being folded back.
We added a white block over me in the pictures I am in because I am not dressed in those photos.

click link below

thank you
Toni

**EXHIBIT 7.0**

## 000b Zoom-In photo from Contreras





EXHIBIT 7.0
194

## 000c Info from Website / Internet

10/6/2020

HOP2 webp (1200×674)











        

10/6/2020

Beer Spa Packages







**EXHIBIT 7.0**

197

2/2

**000d Photo from Contreras 1**



# 001 Supplemental Report



## DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2020-00105987**

CONNECTED # 1

CONNECTED # 2

CONNECTED # 3

**EVENT**

DATE/TIME OF THIS REPORT:
**09/29/2020  15:36**

TITLE / DESCRIPTION
**Additional follow-up/case closed-unfounded**

| DISTRIBUTION | | | |
|---|---|---|---|
| ☐ KARLY's LAW | ☐ DA | ☐ DHS | ☐ JUSTICE COURT |
| ☐ MDT | ☐ JUVENILE | ☐ KIDS CENTER | ☐ CIRCUIT COURT |
| ☐ USE of FORCE | ☐ DMV | ☐ DETECTIVES | ☐ MENTAL HEALTH |
| ☐ PURSUIT | ☐ OLCC | ☐ ME | ☐ ENVIRONMENTAL HEALTH |
| ☐ K-9 | Other: | | |

**OFFENSES**

| CTS | STATUTE/DESCRIPTION | | ATTEMPT/COMMIT |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**SUBJECT**

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | |
|---|---|---|
| | | |

**SUBJECT**

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | PRIMARY PHONE |
|---|---|---|---|
| ADDRESS (STREET, CITY, STATE, ZIP) | | | PHONE #2 |
| DOB | AGE or AGE RANGE | SEX | RACE | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |

**SUBJECT**

| SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | |
|---|---|---|
| | | |

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| Barker, Joshua 10L63 | 02/04/2021 | Rupert, Ty | 02/05/2021 11:56 |



# DESCHUTES COUNTY SHERIFF'S OFFICE
### CASE SUPPLEMENT REPORT
63333 West Highway 20
Bend, OR 97701

CASE# **2020-00105987**

---

## NARRATIVE

**SUPPLEMENTAL REPORT BY:** Barker, Joshua
**DATED:** 02/03/2021

**ATTACHMENTS:**

None

**NARRATIVE:**

While reviewing this investigation, I noted Deputy Brent Crosswhite had taken a report from Toni Contreras, in Which Toni was concerned a two-way mirror was used to view her and her husband in an unclothed state during a visit to Hop in the Spa, located at 371 W. Cascade Ave in Sisters. Please refer to Deputy Crosswhite's case report for further details.

By reviewing the photographs Toni had sent Deputy Crosswhite depicting what she believed was a two-way mirror in the room, it was difficult to decipher what she was referring to. The backside of the mirror did appear to change from a lighter to darker colored brown or black in different photographs; however, these photographs were taken from different angles. I was unable to determine if what Toni was seeing was in-fact from behind the mirror, or if the mirror was reflecting different angles and objects due to the angle of the photograph. Different filter(s) were also used in the photographs taken by Toni and her husband, so the lighter and darker images were altered with the filter(s) being used.

By researching Hop in the Spa online, I was able to determine the business offers "the world's first and only craft beer spa" experience. The concept, in substance, offers a private soak room with two tubs, where the customers can soak in tubs filled with hops, herbs, minerals and other proprietary ingredients, creating the craft beer inspired microbrew soak.

I reviewed multiple images online, on both the Hop in the Spa website, and Google images posted by customers etc. By viewing the images, I noted similar findings, in that photographs taken from different positions made the mirror appear as if something was behind it, due to the fact it was reflecting different colors and textures of walls and objects behind the photographer.

I made multiple attempts to gain access to the business for further investigation; however, due to recent restrictions surrounding the COVID-19 pandemic, this proved difficult as the state of Oregon had multiple restrictions and "freezes" that forced businesses to close their doors and not allow public access.

During this time, Toni had retained and hired a civil attorney, Mathew Ribardy, for a civil suit against the owner of Hop in the Spa, Michael Boyle, as she believed he had been spying on her in person or with cameras while she was in an unclothed while at his establishment. I had been in communication with Ribardy and advised the criminal investigation was still ongoing; however, would be delayed due to the fact the business was closed due to COVID-19. Ribardy informed me he would place the civil lawsuit on hold until I could complete a criminal investigation before he contacted Boyle related to the civil lawsuit. Ribardy also requested any future correspondence regarding the case be directed to him instead of Toni.

---

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| **Barker, Joshua 10L63** | **02/04/2021** | **Rupert, Ty** | **02/05/2021  11:56** |



**DESCHUTES COUNTY SHERIFF'S OFFICE**

CASE SUPPLEMENT REPORT

63333 West Highway 20

Bend, OR 97701

CASE# **2020-00105987**

---

**NARRATIVE (Continuation)**

---

On 02/02/2021, I was able to gain access to the building with a purchased/reserved soak package. It should be noted, as a paying customer, I was allowed access to the soaking room for the purposes of the purchased package, and I was also allowed access to the rest of the building, as a tour was given to me by Boyle, and I was allowed to walk through. After spending approximately three hours in the establishment, Detective Kyle Kalmbach and I were able to determine the following:

Two tubs are set up in the soak room. This was the only soak room in the building set up for the craft beer soak, and the same room Toni and her husband had been in. This room was thoroughly inspected for any cameras or peepholes etc. that would lead me to believe the person inside of the room was being spied on; however, I was unable to locate anything of the nature.

I was able to determine the mirror was mounted directly to the wall and a wooden structure was built around it; however, by looking behind the structure, it was evident it was built for aesthetics and did not alter the mirror. The mirror appeared to be a standard mirror and I could not see anything behind it. Based on the fact it was mounted directly to the wall, it would be a possibility somebody could access the mirror from the other side of the wall; however, this was determined to be impossible. By accessing the room directly on the other side of the wall, which was a bathroom, I was able to determine there was no access through the wall to the mirror. It was a solid wall that was not altered in any fashion, so it would be impossible to look through the mirror or record someone from the mirror on the other side of the wall.

The inside of the soak room was photographed and later downloaded into DIMS as evidence. Refer to evidence Item #JB1 for further details and description of the soak room.

During my time at Hop in the Spa, I was also able to access other areas of the building and did not locate any cameras, peepholes, or anything else that was suspicious in nature that would lead me to believe the customers were being spied on.

While inside the business, although the reports of the criminal behavior were unfounded, I noted numerous county code violations and concerns related to the operational cleanliness of the business. For example, the floor was caving/falling in in a hallway, multiple unpermitted additions (according to Boyle's own statements to me) and bare electrical wiring throughout. Glasses and dishes were being reused without being washed or cleaned for multiple customers and the soak tubs were not cleaned between customers either. Although these violations and concerns will not be fully documented in this criminal investigation, it will be documented for further investigation by the correct department(s).

On 02/03/2021, I contacted Toni's attorney, Ribardy, to advise him of my findings. Ribardy thanked me for my time and requested I contact Toni and relay the information to her myself. I contacted Toni by telephone; however, she was at work and unavailable to speak with me. On 02/04/2021, I was able to speak with Toni again by telephone and was able to discuss the investigation and my findings with her. Toni was pleased to hear her allegations and/or assumptions were unfounded and thanked me for my time.

Throughout the course of this investigation, it was determined the allegations of Boyle spying on or recording Toni and her husband in an unclothed state while they visited his establishment were unfounded. Although there were other concerns,

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| **Barker, Joshua 10L63** | **02/04/2021** | **Rupert, Ty** | 02/05/2021  11:56 |

 



# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**
63333 West Highway 20
Bend, OR 97701

CASE# **2020-00105987**



## NARRATIVE (Continuation)

such as operational cleanliness etc. I did not note anything criminal in nature related to allegations of Invasion of Personal Privacy and/or Harassment. The concerns related to operational cleanliness and potential business related and/or county code violations will be forwarded to the proper departments for further review.

**AFTER ACTION:**

No further action

**Case closed-Unfounded**

**End of report**

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| **Barker, Joshua 10L63** | **02/04/2021** | **Rupert, Ty** | **02/05/2021 11:56** |

# EXHIBIT 8



Plaintiff Exhibit
# 8
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 8.1



EXHIBIT 8.1

Case 6:22-cv-01361-AA

# EXHIBIT 8.2



Plaintiff Exhibit
#8.2
Date 09/12/2022
Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 9




## DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2021-00030013**

During this contact with Donica, she told deputy Conard and I, she still had the bikini in her vehicle and she had not washed it since her time at Hop In The Spa. Donica retrieved the bikini from her vehicle and showed it to Deputy Conard and myself.

I saw what appeared to be a white/gray residue in the stitching of the side edges of Donica's bikini top. The white/gray residue appeared to be the same color of the mineral compound inside a crock pot on the floor of the reflexology room Donica had taken a photo of while in that room. The residue in the stitching was towards the apexes of the triangle sections as well as along the middle outside edges and on the lower middle inside edges of both triangle sections. The location of the residue on Donica's bikini seemed to be consistent with her description of where Boyle had moved his hands onto her breasts as he was rubbing her upper chest.

Donica's bikini bottom appeared to be shallow cut in the front crotch area. I had Donica place her hands next to the bikini bottoms as a visual reference of where she remembered Boyle having his hands as he was rubbing her inner thighs.

I took several photos of the bikini and entered them into evidence (DIMS).

On 06/21/2021, Deputy Fowlds and I met with Donica in person in Redmond to attempt a third phone call with Boyle. Boyle answered and spoke with Donica.

During the phone conversation, Boyle stated a few times he is not allowed to perform massages and all he could do are hands and feet. Boyle said he could only apply the minerals with a "roller".

At one point Donica mentioned to Boyle her mother, Kelly, had felt cheated because she had not received the same experience as Donica had. Boyle responded by saying so[~~~~] wearing a one piece bathing suit as the reason.

I entered both phone attempts to Boyle as well as the phone conversation be[~~~~] into evidence (DIMS) at the Sisters sub-station. Refer to the recordings for fu[~~~~]

As part of my investigation into this case, I conducted online research of Oregon Revised Statutes (ORS). My research led me to ORS Volume 17 (Occupations), Title 52 (Occupations and professions),

> Plaintiff Exhibit
> # 7
>
> Date 09/12/2022
>
> Case # 6:22-CV-01361-AA

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| Hudson, Michael 10L46 | 06/22/2021 | Davis, Chad Everett  06/24/2021  01:02 |

# EXHIBIT 9.1



## DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**
63333 West Highway 20
Bend, OR 97701

CASE# **2021-00030013**



### NARRATIVE (Continuation)

Chapter 687 (Massage Therapists; Direct Entry Midwives). I discovered under ORS 687.011 (Definitions), massage is defined as:

*(4)(a) "Massage," "massage therapy" or "bodywork" means the use of pressure, friction, stroking, tapping or kneading on the human body, or the use of vibration or stretching on the human body by manual or mechanical means or gymnastics, with or without appliances such as vibrators, infrared heat, sun lamps or external baths, and with or without lubricants such as salts, powders, liquids or creams, for the purpose of, but not limited to, maintaining good health and establishing and maintaining good physical condition.*

I found ORS 687.021 (Practice of massage without license prohibited; operation of massage facility without permit prohibited; injunction against violation). Per the statute:

*(1) A person may not:*
*(a)Engage in or purport to engage in the practice of massage without a massage therapist license issued by the State Board of Massage Therapists under ORS 687.051*

I learned violation of ORS 687.021 is a crime at the misdemeanor level (A misdemeanor).

I also learned per ORS 687.031 that ORS 687.021 does not apply to practitioners of reflexology, however, the exemption statue explains the limitations for reflexology. Under section 1, subsection (i) the statute states:

*(i) Practitioners of reflexology who do not claim expressly or implicitly to be massage therapists and who limit their work to the practice of reflexology through the application of pressure with the thumbs to reflex points on the feet, hands and ears for the purpose of bringing the body into balance, thereby promoting the well-being of clients*

During my interview with Donica, Melea, and Dana, each one of them told me Boyle had informed the~~ he was not a Licensed Massage Therapist (LMT) and all he was allowed to do reflexology on their hands and feet.

Plaintiff Exhibit
# 7/
Date 09/12/2022

After interviewing the women mentioned above, as well as my research into the relate to massage, my investigation led me to determine Boyle provided illegal

Case # 6:22-CV-01361-AA

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| Hudson, Michael 10L46 | 06/22/2021 | Davis, Chad Everett 06/24/2021 01:02 |



## DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE REPORT**

CASE# **2021-00035317**

63333 West Highway 20

Bend, OR 97701

### NARRATIVE (Continuation)

women I have spoken with regarding my investigation as the "Reflexology", "Aurora", and by Boyle himself telling me it's his "Northern Lights" room. The room contains what appears to be a massage table positioned in the center of the room. The wall are decorated with white sheets and some type of silver foil. There is a light projector that displays small green laser lights around the entire room such as one would commonly see used to display lights on a house during the holiday season.

Walking past the soaking and massage rooms there is kitchen/bar on the east wall with a counter and a couple chairs. Across from the bar counter, are a set of stairs leading up to the second floor concealed by a curtain. The west wall of the stairs is the east wall of the soaking room. Walking past the kitchen/bar area and turning right (west) there are a set of stairs leading to the dirt basement also concealed by a curtain. Beyond these stairs is the only restroom for the building.

According to Oregon Revised Statue (ORS) 687.011 – Definitions, the term "massage" is defined as:

> ... *"Massage," "massage therapy" or "bodywork" means the use of pressure, friction, stroking, tapping or kneading on the human body, or the use of vibration or stretching on the human body by manual or mechanical means or gymnastics, with or without appliances such as vibrators, infrared heat, sun lamps or external baths, and with or without lubricants such as salts, powders, liquids or creams, for the purpose of, but not limited to, maintaining good health and establishing and maintaining good physical condition...*

According to ORS 687.021 – Practice of massage without license prohibited, the statute states:

> ... *A person may not engage in or purport to engage in the practice of massage without a massage therapist license issued by the State Board of Massage Therapists...*

There are exemptions where an individual does not need to possess a massage license, however, the scope of practice is limited. According to ORS 687.031 – Application of ORS 687.021, the statute states:

> ... *do not apply to:* (1) *Practitioners of reflexology who do not claim expressly or implicitly to be massage therapists and* **who limit their work to the practice of reflexology through the application of pressure with the thumbs to reflex points on the feet, hands and**

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Hudson, Michael 10L46** | **08/04/2021** | **Davis, Chad Everett 08/05** |

Plaintiff Exhibit
# 91
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 10

```
 1

 2

 3

 4

 5

 6                  IN THE CIRCUIT COURT OF THE STATE OF OREGON

 7                         FOR THE COUNTY OF DESCHUTES
```

| In the Matter of: | No. |
|---|---|
| MICHAEL BOYLE, | **COMPLAINT** |
| Plaintiff, | (Trespass, Misappropriation of Trade Secrets, Attempted Interference in Prospective Economic Relations) |
| v. | |
| KELLY RUSTRUM, and DONIKA RUSTRUM, | Claim for More than $10,000 ($500,000.00) Filing Fee at ORS 21.160(1)(c): $594 |
| Defendants. | **NOT** Subject to Mandatory Arbitration |

COMES NOW, Plaintiff Michael Boyle, and alleges to the Court as follows:

### PARTIES, VENUE, AND JURISDICTION

1.

Plaintiff is a natural person and a resident of Deschutes County, Oregon.

2.

Defendant Kelly Rustrum is an individual person, and upon information and belief, a resident of Deschutes County, Oregon.

3.

Defendant Donika Rustrum is an individual person, and upon information and belief, a resident of Deschutes County, Oregon.

4.

All actions complained of herein occurred, or had their nexus of o

Plaintiff Exhibit
#_____

Date 09/12/2022

Case # 6:22-CV-01361-AA

**Page -1- COMPLAINT (Defamation, Intentional Infliction of Emoti**

## GENERAL ALLEGATIONS

5.

This case involves trespass, attempted intentional interference in prospective economic relationships, and - most central to all claims - corporate espionage. Briefly, Defendants, while pretending to be customers at Plaintiff's business premises, instead brazenly trespassed and made recordation, including photographs, in an attempt to steal proprietary information, regarding Plaintiff's business and trade secrets.

6.

Plaintiff, for his part, is the owner and originator of a spa process which, in addition to other trade secrets held by him, utilizes a proprietary method of delivering a non-traditional spa treatment, which - in its simplest description - incorporates hops, grains and other ingredients brewed in soak tubs - as opposed to water. The actual process involved is a proprietary trade secret, which Plaintiff takes great pains to keep confidential.

7.

From 2016 onward, Plaintiff operated a retail public access spa facility, known as "Hop in the Spa", which advertised itself as "America's First Beer Spa", in Sisters, Oregon.

8.

As part of his ongoing efforts to secure and safeguard his proprietary information and trade secrets, Plaintiff's business locale contained extensive signage, advising patrons that any sort of photographing or video recording was strictly forbidden. Plaintiff also had numerous security camera set up in the public area of the business, as well as the area which were off-limits to patrons. The actions were taken not only to protect the security and safekeeping of his proprietary trade secrets and information, but also for the protection of the business' patrons.

9.

On or about June 13, 2021, the business received a telephone call from an individual who identified herself as Kelly Rustrum (Defendant herein) inquiring about obtaining a spa appointment for herself and co-Defendant Donika Rustrum. An appointment was booked for the following Saturday, June 19th; the

**Page -2- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

1  Defendants arrived at on the 19th, at the scheduled appointment time of 11:30 a.m. Upon arrival, they

2  were greeted by Plaintiff and invited to sit at the common area.

3                                           10.

4          After a period of socialization, during which the Defendants were clearly informed as to the

5  Plaintiff's policy regarding photography, and that in addition to the photography policy, that the building

6  had audio and video recording at all times, except in areas where privacy is expected, i.e. , restrooms and

7  dressing areas. Moreover, the Defendants were specifically informed that at any time they no longer wished

8  to authorize the recording, that the request would be honored, their appointment ended, and a refund issued.

9  Both Defendants acknowledged and agreed to these policies. This part of the appointment was digitally

10 recorded, with both audio and video, on a surveillance camera, which keeps its recordings archived and

11 available for a period of three years, and which is not web-connected, or otherwise available to the general

12 public.

13                                          11.

14         After a period of time in the treatment spa, the Defendants each requested that they be provided with

15 what is called the "Aurora Treatment"; this is a proprietary reflexology and tissue manipulation process,

16 which is offered gratis to all customers, and was not pre-advertised.

17                                          12.

18         Defendant Donika Rustrum was the first to receive the Aurora Treatment, and there were no

19 difficulties with the treatment.  During Defendant Kelly Rustrum's Aurora Treatment session, and

20 unbeknownst to Plaintiff, Defendant Donika Rustrum, instead of returning to the spa room or the common

21 area, spent the time walking all through the business, including areas not open to the public and plainly

22 labeled as such, including private office areas and behind the common area.

23                                          13.

24         In addition to the physical examination of these areas Defendant Donika Rustrum was also taking

25 photographs with her cell phone, in clear and direct violation of the business' and Plaintiff's "No

26 Photography"policy.

**Page -3- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

14.

Upon information and belief, Defendant Donika Rustrum's desire to take the Aurora Treatment first, had been for the purpose of allowing her to time, with some rough degree of approximation, how long her co-Defendant's treatment would take; thus, how long she would have to complete her surveillance and photography activities.

15.

Upon discovering, through examination of the security footage, of the Defendants' subterfuge, Plaintiff made demand upon Defendant Donika Rustrum, via text message, that he was aware of the Defendants' activities, and made demand upon them for immediate deletion of any photographs and/or other documentation of her improper activities. Said Defendant did not respond. Plaintiff twice more made demand of Defendants via text, that they acknowledge their responsibility to delete the improperly-acquired material; although he received electronic confirmation of the receipt of his text messages, Defendants never responded.

16.

Plaintiff, for his part, has no other adequate recourse at law.

### FIRST CLAIM FOR RELIEF:

### Trespass

17.

The allegations in paragraphs 1 through 16 inclusive hereinabove, are realleged and incorporated by reference herein as if fully set forth.

18.

The illegal access, as described above, was sought in furtherance of the illegal and conspiratorial actions described hereinabove, and therefore constituted criminal trespass in the second degree, pursuant to ORS 164.245.

**Page -4- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

19.

Said actions have had the foreseeable and intended result of causing Plaintiff to fear for his safety, security and well-being - even in the confines of his own business - which fears have caused Plaintiff extreme emotional distress and mental anguish, leaving Plaintiff sick, nervous, depressed, anxious, worried, concerned and unable to enjoy peace of mind and a feeling of security in his own business, for which Plaintiff should be entitled to relief in the form of a Judgment and money awards in his favor, and against Defendants and each of them, for Trespass, in the reasonable sum of Twenty-Five Thousand dollars ($25,000) or such other reasonable sums for each as may be proven at trial.

## SECOND CLAIM FOR RELIEF:
### Misappropriation of Trade Secrets

20.

Plaintiff's Second Claim for Relief Action is alleged herein in addition to and not in the alternative to and without waiving the allegations of his First Claim for Relief. The allegations in paragraphs 1 through 16 inclusive hereinabove, are realleged and incorporated by reference herein as if fully set forth.

21.

Plaintiff's Trade Secrets, as alleged above, constitute trade secrets as defined under ORS 646.461, and the Federal Defend Trade Secrets Act (18 U.S.C. § 1836).

22.

Plaintiff's Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from use of the Trade Secrets.

23.

Plaintiff, for his part, has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including restricting access to the most sensitive trade secret information to only those with a business need to know or access the information for purposes of performing their job for

Page -5- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )

1   Plaintiff, and having employees, contractors and third parties enter into agreements which expressly prohibit
2   the use, removal and disclosure of such information.

3                                           24.

4       The foregoing conduct of Defendants constitutes an actual and threatened misappropriation and
5   misuse of Defendant's trade secret information in violation of ORS 646.461 et seq., and the Defend Trade
6   Secrets Act, 18 U.S.C. §1836.

7                                           25.

8       Defendants' actions with respect to Plaintiff's Trade Secrets, as alleged above, were a deliberate
9   scheme, plan, and attempt to deprive Plaintiff of the benefits of his own substantial investment and efforts
10  and steal the fruits of years of his labor.

11                                          26.

12      As a proximate result of Defendants' actions as alleged above, Plaintiff to date has suffered, and will
13  continue to suffer, actual damages, including, but not limited to, loss of capital, loss of valuable business,
14  loss of profits and future profits, and loss of goodwill, in an amount to be proven at trial. As a further
15  proximate result of the misappropriation, Plaintiff is informed and believes that Defendants have been
16  unjustly enriched as a result of the misappropriation of Plaintiff's Trade Secrets. The amount of this unjust
17  enrichment cannot presently be ascertained.

18                                          27.

19      As a direct, proximate and foreseeable result of the actions of Defendant as described above, Plaintiff
20  is entitled to a money award in his favor and against Defendants and each of them in the sum of $50,000,
21  or such other reasonable sums as may be proven at trial, for Misappropriation of Trade Secrets.

22                                          28.

23      Further pursuant to the provisions of ORS 646.465(3), Plaintiff is entitled to not only recover
24  damages adequate to compensate for misappropriation, but upon a finding of willful or malicious
25  misappropriation, punitive damages may be awarded in an amount not exceeding twice any actual damages
26  award.

**Page -6- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

29.

Plaintiff is therefore entailed to a punitive damages money award in his favor and against Defendants and each of them in the sum of $500,000, or such other reasonable sums as may be proven at trial, for Punitive Damages for Misappropriation of Trade Secrets.

### **THIRD CLAIM FOR RELIEF:**

### **Attempted Interference in Prospective Economic Relations**

30.

Plaintiff's Third Claim for Relief Action is alleged herein in addition to, and not as an alternative to and without waiving the allegations of his First or Second Claims for Relief. The allegations in paragraphs 1 through 16 inclusive hereinabove, are realleged and incorporated by reference herein as if fully set forth.

31.

The Plaintiff had a previously-existing professional or business relationship with the public at large, which included a prospective economic advantage.

32.

The Defendants, by and through the actions herein described, attempted to commit, and did commit intentional interference with those prospective relationships.

33.

Defendants were not a third party to the Plaintiff's prospective relationships with the parties with whose economic relationships Defendants improperly interfered, and had no reasonable basis for such interference.

34.

The actions ascribed to Defendants, were accomplished through improper means or for an improper purpose.

**Page -7- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

1          35.

2          Plaintiff alleges and will prove at trial, a causal effect between the tortious interference and damage

3     to his prospective economic relationships.

4          36.

5          As a further, proximate and foreseeable result of the actions of Defendants as described above,

6     Plaintiff is entitled to a money award against Defendants and each of them, in the sum of $100,000, or such

7     other reasonable sums as may be proven at trial, for general damages for Attempted Intentional Interference

8     in Economic Relations.

9          37.

10         Plaintiff alleges that if he prevails herein he should be entitled to a money award against Defendant

11    for his reasonably-incurred costs, fees and disbursements herein, including reasonable attorney fees, if any,

12    pursuant to ORS 646.467.

13    / / / / /

14    / / / / /

15    / / / / /

16    / / / / /

17    / / / / /

18    / / / / /

19    / / / / /

20    / / / / /

21    / / / / /

22    / / / / /

23    / / / / /

24    / / / / /

25    / / / / /

26    / / / / /

1      WHEREFORE, Plaintiff Michael Boyle requests judgment against Defendants and each of them, as

2 follows:

3     1. For a money award in his favor and against Defendants and each of them in the sum of $50,000, or such other reasonable sums as may be proven at trial, for Trespass; and

4

5     2. For a money award in his favor and against Defendants and each of them in the sum of $50,000, or such other reasonable sums as may be proven at trial, for Misappropriation of Trade Secrets; and

6     3. For a money award in his favor and against Defendants and each of them in the sum of $150,000, or such other reasonable sums as may be proven at trial Punitive Damages for Misappropriation of

7 Trade Secrets, pursuant to the provisions of ORS 646.465(3); and

8     4. For a money award in his favor and against Defendants and each of them in the sum of $250,000, or such other reasonable sums as may be proven at trial, for Attempted Interference with

9 Prospective Economic Relations; and

10     5. For a money award in his favor and against Defendants and each of them for his reasonably-incurred costs, fees and disbursements herein, including reasonable attorney fees, if any, pursuant

11 to ORS 646.467; and

12     6. For such other relief as the Court may deem appropriate under the circumstances.

13

       Dated this _____ day of _____, 20<u>22</u>.

14

15

16                       Michael Boyle, Plaintiff Pro Se
                        66932 Sagebrush Lane

17                       Bend, Oregon 97703
                      (541) 640-9081

18                       Email: mboyle2016@gmail.com

19

20

21

22

23

24

25

26

**Page -9- COMPLAINT (Defamation, Intentional Infliction of Emotional Distress )**

# EXHIBIT 11

Donica told Kelley she had been touched inappropriately. Kelley stated Donica told her Mike had massaged her feet, neck, and chest line. Donica told her she felt violated and was very upset for the remainder of their time. Kelley said she asked Donica, "Honey, why did you allow him to do that?" Donica was unable to tell her why, but Donica told her it was not her fault and she had not asked for that. At that time, Donica and Kelley got into an argument as they went to the movies. Kelley mentioned Donica was upset all along, the experience seemed kind of "shady," and was nervous there were video cameras or other recordings at the spa.

Kelley told me their time at the spa had been uncomfortable and they would never return, but her and Donica tried to enjoy their time together. I asked Kelley about Mike's demeanor towards her. Kelley told me she felt Mike was "quirky" and had made her a little uncomfortable, but thought he was "harmless." Kelley told me she just did not think Mike was the type to

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| Fowlds, Katie 10L11 | 06/15/2021 | Bailey, William Warren 06/19/2021 03:46 |

EXHIBIT 11          026



# DESCHUTES COUNTY SHERIFF'S OFFICE
## CASE SUPPLEMENT REPORT
63333 West Highway 20
Bend, OR 97701

CASE# 2021-00030013

## NARRATIVE (Continuation)

Plaintiff Exhibit
# 11
Date 09/12/2022
Case # 6:22-CV-01361-AA

violate someone. Kelley explained Mike was a smaller man about her height and she didn't feel threat[ened]
mentioned Mike had "eye contact" and stated he was very observant of his surroundings. Mike was al[so]
attention. Kelly told me she did not believe Sisters was the kind of busy and nice area that would not h[ave]
that for long.

# EXHIBIT 13



10L35
OCSO

2021/07/01 05:00:22

0:58:33

Plaintiff Exhibit
#13
Date 09/12/2022

**SEARCH WARRANT**

FILED
CIRCUIT COURT

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF DESCHUTES**

2021 JUL -2 PM 12: 43

DESCHUTES COUNTY
SEARCH WARRANT

**STATE OF OREGON**                                    |

**COUNTY OF DESCHUTES**                          |

                                                                      |        21 PPO 1658

Verified Correct Copy of Original 7/8/2021

## To Any Peace Officer in the State of Oregon, Greetings:

Upon information given under oath to me by an affidavit signed and sworn to by Deputy Michael

Hudson of the Deschutes County Sheriff's Office, this Court finds probable cause to believe the items

described below are presently located in the area described and that evidence of the crime(s) of

Practice of Massage Without License Prohibited, ORS 687.021 (ORS 687.991 – Criminal Penalties),

crime(s) committed and triable in Deschutes County, Oregon, will be located therein:

## Pursuant to O.R.S. 133.575, You are Hereby Ordered to Search and/or

## Seize:

- The business is located at 371 W Cascade Ave, Sisters, Deschutes County, Oregon. The main
structure is painted brown with brown trim, and has no garage. The business name, "Hop In The
Spa" is prominently displayed on the front of the building, and there is a sign displaying the
business name close to the sidewalk in the front yard. The business resembles an old western
farm house with vertical dark brown wood siding. The roof is constructed of wood cedar
shingles. The structure is two stories with an "A" frame pitched roofline but appears as a one
story from the street view with a small covered front porch. The structure is set back onto the lot
about 30 feet from the centerline of the south sidewalk on Cascade Ave. There is a small fenced
front yard with a small square metal pergola with a tan canvas top acting as a gateway for the
walkway to the front door. The front of the business faces north towards Cascade Ave on the
south side of Cascade Ave. The building is the second business east of the intersection of
Cascade Ave and Pine St.

CASE NUMBER 21-030013 | Search Warrant
CASE AGENT Deputy Michael Hudson

Deschutes

Plaintiff Exhibit
#_13_
Date 09/12/2022

Case # 6:22-CV-01361-AA

## The Subject of Your Search and/or Seizure:

ans 06.50.24

You are authorized to photograph, ~~search for and/or~~ and seize the following evidence:

ans 06.50.24

- Digital devices capable of storing user data (i.e. cellular telephones, computers, tablets, ~~GPS~~ ~~units~~; removable storage) which are in the possession of and/or accessible to Michael Patrick Boyle (DOB 5/22/1961).
- Cameras, microphones, recording devices, and audio/video recordings related to Hop In the Spa business operations.

ans 06.30.24

You are further ordered to photograph, seize, ~~and/or analyze~~ any of the above listed items and make a return of this warrant to me within five (5) business days of its execution.

( ) This warrant is to be executed between 07:00 AM and 10:00 PM.

(✓) This warrant is authorized at all hours, day or night, per ORS 133.565 (3).

(✓) This warrant may be executed within 10 days of issuance, per ORS 133.565 (3)

- Items seized shall be returned within 30 days from date of seizure unless another warrant extends this 30-day time limit.

Issued over my hand at __11:49__ am/pm, on this __30th__ a day of __June__, 20__21__.

__Alycia N Sykore__

**Signature of Circuit Court Judge**

**Deschutes County**

__Alycia N Sykore__

**Printed Name of Circuit Court Judge**

**Deschutes County**

CERTIFIED TRUE COPY OF THE ORIGINAL
Dated this ___ day of ___, 20___
CIRCUIT COURT OF THE STATE OF OREGON
FOR DESCHUTES COUNTY
BY: _____
COURT CLERK

Verified Correct Copy of Original 7/8/2021

# EXHIBIT 14



Plaintiff Exhibit
# 14
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 14.1



Plaintiff Exhibit
# 14
Date 09/12/2022
Case # 6:22-CV-01361-A

# EXHIBIT 15



# DESCHUTES COUNTY SHERIFF'S OFFICE

### CASE SUPPLEMENT REPORT      CASE# **2020-00105987**

63333 West Highway 20

Bend, OR 97701



## NARRATIVE (Continuation)

On 02/02/2021, I was able to gain access to the building with a purchased/reserved soak package. It should be noted, as a paying customer, I was allowed access to the soaking room for the purposes of the purchased package, and I was also allowed access to the rest of the building, as a tour was given to me by Boyle, and I was allowed to walk through. After spending approximately three hours in the establishment, Detective Kyle Kalmbach and I were able to determine the following:

Two tubs are set up in the soak room. This was the only soak room in the building set up for the craft beer soak, and the same room Toni and her husband had been in. This room was thoroughly inspected for any cameras or peepholes etc. that would lead me to believe the person inside of the room was being spied on; however, I was unable to locate anything of the nature.

I was able to determine the mirror was mounted directly to the wall and a wooden structure was built around it; however, by looking behind the structure, it was evident it was built for aesthetics and did not alter the mirror. The mirror appeared to be a standard mirror and I could not see anything behind it. Based on the fact it was mounted directly to the wall, it would be a possibility somebody could access the mirror from the other side of the wall; however, this was determined to be impossible. By accessing the room directly on the other side of the wall, which was a bathroom, I was able to determine there was no access through the wall to the mirror. It was a solid wall that was not altered in any fashion, so it would be impossible to look through the mirror or record someone from the mirror on the other side of the wall.

The inside of the soak room was photographed and later downloaded into DIMS as evidence. Refer to evidence Item #JB1 for further details and description of the soak room.

During my time at Hop in the Spa, I was also able to access other areas of the building and did not locate any cameras, peepholes, or anything else that was suspicious in nature that would lead me to believe the customers were being spied on.

While inside the business, although the reports of the criminal behavior were unfounded, I noted numerous county code violations and concerns related to the operational cleanliness of the business. For example, the floor was caving/falling in in a hallway, multiple unpermitted additions (according to Boyle's own statements to me) and bare electrical wiring throughout. Glasses and dishes were being reused without being washed or cleaned for multiple customers and the soak tubs were not cleaned between customers either. Although these violations and concerns will not be fully documented in this criminal investigation, it will be documented for further investigation by the correct department(s).

On 02/03/2021, I contacted Toni's attorney, Ribardy, to advise him of my findings. Ribardy thanked me for my time and requested I contact Toni and relay the information to her myself. I contacted Toni by telephone; however, she was at work and unavailable to speak with me. On 02/04/2021, I was able to speak with Toni again by telephone and was able to discuss the investigation and my findings with her. Toni was pleased to hear her allegations and/or assumptions were unfounded and thanked me for my time.

Throughout the course of this investigation, it was determined the allegations of Boyle spying on or recording Toni and her husband in an unclothed state while they visited his establishment were unfounded. Although there were other concern---

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| **Barker, Joshua 10L63** | **02/04/2021** | **Rupert, Ty** | **02/05** |

DCS

*Plaintiff Exhibit*
*# 10*
*Date 09/12/2022*
*Case # 6:22-CV-01361-AA*

# EXHIBIT 15.1



# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2021-00030013**

| NARRATIVE |
|---|

Attachments: None

Narrative:

On 7/29/21, I received an email from the Sheriff's Office regarding Michael Boyle wanting to discuss damage to his business as a result of the search warrant service on 6/30/21. After reviewing the email, it reminded me that a mirror had been damaged in the soaking room.

I reviewed my supplemental report regarding my involvement in the search warrant service and realized I had not mentioned the damage to the mirror. This supplemental will document the damage to the mirror.

During the search warrant service, I was conducting a follow-up search of the soaking tub room and decided to do a further inspection of a mirror that was suspected of being a location where Boyle may have a hidden camera. The mirror was approximately 10-14" tall and 36-40" wide. The mirror appeared to framed with a press board style wood.

The mirror was positioned in an opening on the south wall of the soaking room and had some decorations positioned in front of it. I removed the decorations from the framework below the mirror and attempted move the mirror. I could see there was something behind the mirror, so I pried it away from the opening and in doing so, the mirror flexed and it cracked the glass. I looked behind the mirror and didn't locate any recording devices. The mirror was left in place. I would estimate the mirror was valued at under $50.00.

Additionally, after reviewing the evidence photos I saw an electrical outlet cover that was removed from the wall that was cracked in the process of removing it. This was photographed by Dep. Morris upon our exit from the building. Outlet covers like this are typically valued at less than $5.00.

Dep. Morris had taken overall photos of the business as it was found upon our initial entry to the business. Those photos included photos of the mirror intact in the south wall. I spoke with Deputy Bryan Morris and asked him to take photos of the mirror to document the damage. Dep. Morris took exit photos of the entire business at the conclusion of the search warrant.

Case closed, arrest.

End of report.

Plaintiff Exhibit

# _151_

Date 09 / 12 / 2022

Case # 6:22-CV-01361-AA

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| Davis, Chad 10A15 | 07/29/2021 | Janes, Jayson | 08/04/2021  02:25 |

DCSO Case Supplement 2021-00030013 Page 2 OF 2

# EXHIBIT 16

1   _mixture and then roll it onto a woman's legs, arms shoulders and the upper chest area. Once the_

2   _minerals were applied. Boyle stated he would wrap the woman in a thin blanket to let the warm mineral_

3   _soak in. I told Boyle by mixing the mineral powder with water sounded like it could appear like or_

4   _resemble a lotion, but Boyle told me it was not._

5

6   _During our conversation with Boyle, Sergeant Brown informed him we had been granted a search_

7   _warrant by the court and would be executing the search warrant. I read Boyle a copy of the search_

8   _warrant verbatim in its entirety and provided him a copy of the search warrant. Boyle remained on_

9   _scene sitting in the same chair he had been while we were talking with him._

10

11  _I told Boyle the search warrant authorized Law Enforcement to seize his smartphone. Boyle asked how_

12  _long we were keeping his phone because it was the primary method of conducting his business._

13  _Sergeant Brown asked Boyle if he would consent to having his phone analyzed. Boyle told us he would_

14  _and handed the phone to Sergeant Brown and provided him with the passcode. I completed a Consent_

15  _to search form, watched Boyle sign it. I then signed it and provided Boyle with a copy._

16

17  _Boyle stated he had another phone inside near the bar area that he used as an internet hotspot. A_

18  _white and silver iPhone as well as a black iPhone was located in the bar on the counter. Boyle stated_

19  _the black iPhone was an old phone of his._

20

21  _The security camera (Kami Brand) was located on a shelf behind the bar however and a black_

22  _Samsung tablet was found on the floor across from the bar. These items were seized as well as 4 flash_

23  _drives found in various locations in and around the bar area._

24

25  _Also discovered in the Aurora room were two massage tools – Homedics four prone electric massager_

26  _blue & white in color, and a blue & white Conair electric massager. Both massage tools appeared to_

27  _have the mineral compound on them. Boyle stated he used both devices for himself only and had never_

28  _used them on a client._

29

30  _The entire interior of the business appeared to be filthy from the bar an_

31  _room, upstairs, and the basement. There were mouse and rat feces sc_

32  _deputies told me they had seen live mice scattering about on the floor._

33  _dried hops and chunks of food (pretzels) all over the floor. Wherever I_

34  _large piles of ants swarmed around and on the food. There were unsh_

Plaintiff Exhibit
# _16_
Date 09/12/2022

Case # 6:22-CV-01361-AA

Verified Correct Copy of Original 7/15/2021

# EXHIBIT 17.0



Plaintiff Exhibit
#17
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 17.1



# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2021-00030013**

Supplemental Report By: Deputy Michael Hudson

Date: 11/09/2021

**Attachments:**

1. Seized Items List From 06/30/2021 Search Warrant (1 page)

**Narrative:**

This report is to clarify the supplemental report (#8 dated 07/19/2021) as it pertains to the items seized during the execution of the search warrant on 06/30/2021.

In the aforementioned supplemental report (#8), Boyle disclosed he had a security camera located near the bar area that wirelessly connected to a digital video recording device (DVR). During the search of the business, the camera mentioned by Boyle was in fact located on a shelf in the bar area. The camera was a "Kami" brand.

A conversation was had involving the team of Deputies (including myself), Detectives and Digital Forensic Detectives present about the camera and whether or not to seize it. Digital Detective Lilienthal informed the group the camera only wirelessly transmitted data to another device, such as a DVR, and didn't have any internal digital memory storage. Based on this information, I determined the camera didn't have any evidentiary value to this case and it was not seized to be analyzed at a later date. The camera was left in the bar area.

Attached to this report is the seized items list from all items taken from the business on 06/30/2021. This is the same list attached to supplemental report #7, dated 07/04/2021, and the same list I presented to the Circuit Court on 07/02/2021 as part of my search warrant return. As the list shows, the camera is not listed as a seized item.

Plaintiff Exhibit

# 121

Date 09/12/2022

Case # 6:22-CV-01361-AA

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Hudson, Michael 10L46** | **11/09/2021** | **Davis, Chad** |

DCSO Case Supplement 2021-00030013 Page 2 OF 3

233

Case 6:22-cv-01361-AA

# EXHIBIT 18

# Kami Wire-Free Outdoor Camera
## SanDisk -32 GB - micro SDHC Card Positions



SD Card Ejected Position     SD Card Inserted Position     SD Card Removed

EXHIBIT 18

Plaintiff Exhibit
# 18
Date 09/12/2022

   

## DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**                    CASE# **2021-00030013**

63333 West Highway 20

Bend, OR 97701

---

**NARRATIVE**

---

Supplemental Report By: Deputy Michael Hudson

Date: 11/09/2021

**Attachments:**

1. Seized Items List From 06/30/2021 Search Warrant (1 page)

**Narrative:**

This report is to clarify the supplemental report (#8 dated 07/19/2021) as it pertains to the items seized during the execution of the search warrant on 06/30/2021.

In the aforementioned supplemental report (#8), Boyle disclosed he had a security camera located near the bar area that wirelessly connected to a digital video recording device (DVR). During the search of the business, the camera mentioned by Boyle was in fact located on a shelf in the bar area. The camera was a "Kami" brand.

A conversation was had involving the team of Deputies (including myself), Detectives and Digital Forensic Detectives present about the camera and whether or not to seize it. Digital Detective Lilienthal informed the group the camera only wirelessly transmitted data to another device, such as a DVR, and didn't have any internal digital memory storage. Based on this information, I determined the camera didn't have any evidentiary value to this case and it was not seized to be analyzed at a later date. The camera was left in the bar area.

Attached to this report is the seized items list from all items taken from the business on 06/30/2021. This is the same list attached to supplemental report #7, dated 07/04/20: presented to the Circuit Court on 07/02/2021 as part of my search warra camera is not listed as a seized item.

Plaintiff Exhibit #_/9_

Date 09/12/2022

Case # 6-22 CV 01261 .. .

---

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Hudson, Michael 10L46** | **11/09/2021** | **Davis, Chad Everett  11/10/2021  10:50** |

DCSO Case Supplement 2021-00030013 Page 2 OF 3

# EXHIBIT 19



Plaintiff Exhibit
# *19*
Date 09/12/2022

Case 6:22-cv-01361-AA

# EXHIBIT 20

10L35
DCSO

Plaintiff Exhibit
# 20
Date 09/12/2022
Case # 6:22-CV-01361-AA

0:03:28

1:03:05

2021/07/01 04:56:12



10L35
DCSO

2021/07/01

Plaintiff Exhibit
#20
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 22



Plaintiff Exhibit
#22
Date 09/12/2022
Case # 6:22-CV-01361-AA

Plaintiff Exhibit

# EXHIBIT 23









Plaintiff Exhibit
#22
Date 09/12/2022
Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 24

21AD01658
WTSR
Warrant — Search
14031764

Verified Correct Copy of Original 7/2/21

**SEARCH WARRANT**

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF DESCHUTES**

FILED
CIRCUIT COURT

2021 JUL -2 PM 12: 43

DESCHUTES COUNTY
SEARCH WARRANT

4

5    **STATE OF OREGON**             |

6    **COUNTY OF DESCHUTES**      |

7                               |     21AD01658

8

9          **To Any Peace Officer in the State of Oregon, Greetings:**

10

11   Upon information given under oath to me by an affidavit signed and sworn to by Deputy Michael

12   Hudson of the Deschutes County Sheriff's Office, this Court finds probable cause to believe the items

13   described below are presently located in the area described and that evidence of the crime(s) of

14   Practice of Massage Without License Prohibited, ORS 687.021 (ORS 687.991 – Criminal Penalties),

15   crime(s) committed and triable in Deschutes County, Oregon, will be located therein:

16

17       **Pursuant to O.R.S. 133.575, You are Hereby Ordered to Search and/or**

18                                 **Seize:**

19

20   •  The business is located at 371 W Cascade Ave, Sisters, Deschutes County, Oregon. The main

21       structure is painted brown with brown trim, and has no garage. The business name, "Hop In The

22       Spa" is prominently displayed on the front of the building, and there is a sign displaying the

23       business name close to the sidewalk in the front yard. The business resembles an old western

24       farm house with vertical dark brown wood siding. The roof is constructed of wood cedar

25       shingles. The structure is two stories with an "A" frame pitched roofline but appears as a one

26       story from the street view with a small covered front porch. The structure is set back onto the lot

27       about 30 feet from the centerline of the south sidewalk on Cascade Ave. There is a small fenced

28       front yard with a small square metal pergola with a tan canvas top acting as a gateway for the

29       walkway to the front door. The front of the business faces north towards Cascade Ave on the

30       south side of Cascade Ave. The building is the second business east of the intersection of

31       Cascade Ave and Pine St.

32

33

CASE NUMBER 21-030013 | Search Warrant
CASE AGENT Deputy Michael Hudson

Desc

Plaintiff Exhibit
# 2

Date 09/12/2022

Case # 6:22-CV-01361

## The Subject of Your Search and/or Seizure:

ans 06.30.21

You are authorized to photograph, ~~search for and/or~~ and seize the following evidence:

ans 06.30.21

- Digital devices capable of storing user data (i.e. cellular telephones, computers, tablets, ~~flash drives,~~ removable storage) which are in the possession of and/or accessible to Michael Patrick Boyle (DOB 5/22/1961).
- Cameras, microphones, recording devices, and audio/video recordings related to Hop In the Spa business operations.

ans 06.30.21

You are further ordered to photograph, seize, ~~and/or analyze~~ any of the above listed items and make a return of this warrant to me within five (5) business days of its execution.

( ) This warrant is to be executed between 07:00 AM and 10:00 PM.

(✓) This warrant is authorized at all hours, day or night, per ORS 133.565 (3).

(✓) This warrant may be executed within 10 days of issuance, per ORS 133.565 (3)

- Items seized shall be returned within 30 days from date of seizure unless another warrant extends this 30-day time limit.

Issued over my hand at __1149__ am/~~pm~~, on this __30th__ a day of __June__, 20__21__.

__Alycia N Sykore__

**Signature of Circuit Court Judge**
**Deschutes County**

__Alycia N Sykore__

**Printed Name of Circuit Court Judge**
**Deschutes County**

CERTIFIED TRUE COPY OF THE ORIGINAL
Dated this ___ day of ___, 20___.
CIRCUIT COURT OF THE STATE OF OREGON
FOR DESCHUTES COUNTY

BY: _____
COURT CLERK

Plaintiff Exhibit
# 24
__ of 2
Date 09/12/2022
ffice

Case # 6:22-CV-01361-AA

CASE NUMBER 21-030013 | Search Warrant
CASE AGENT Deputy Michael Hudson

Verified Correct Copy of Original 7/8/2021



# Deschutes County Sheriff's Office
## Compact

Deschutes County
Sheriff's Office
Sheriff L. Shane Nelson
63333 West Hwy 20
Bend, OR 97703
(541) 388-6655

**Print Date/Time:** 12/21/2021 15:49
**Login ID:** danac
**Case Number:** 2021-00030013

**ORI Number:**     Deschutes County Sheriff
OR0090000

| Date | Type | Category | Description | Item | Qty |
|---|---|---|---|---|---|
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD9 - Conair, blue and white electric massager, located in the reflexology room by Det. Kalmbach. | 64530 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD8 - Homedics four prong blue and white, battery powered massager, located in the reflexology room by Det. Kalmbach. | 64529 | 1 |
| 07/04/2021 | * Evidence (not drugs) | _Evidence-Other | MH3 - Signed Consent to Search form signed by Boyle to search his iPhone | 64591 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD12 - (845) Photographs taken during search warrant execution at Hop in Spa on 06/29/2021. Downloaded into Detectives DIMS Station on 07/01/2021 @ 0924 hours. | 64520 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD11 - Harman flashdrive, located by Dep. Morris on the back shelf in the bar area. Item retained by Det. Lilienthal to go to DCFL. | 64532 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD7 - Cruzer flashdrive, black 16 GB, located by Dep. Morris in a magnetic shelf attached to the vertical fridge in the bar area. Item retained by Det. Lilienthal to go to DCFL. | 64528 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD6 - Verbatim flashdrive, blue and white in color, located by Det. Klatt in small Samsung TV in front area. Item retained by Det. Lilienthal to go to DCFL. | 64527 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD5 - Flashdrive, located in the large Samsung TV in the bar area by Det. Lilienthal. Item retained by Det. Lilienthal to go to DCFL. | 64526 | 1 |
| 07/01/2021 | * Evidence (not drugs) | _Evidence-Other | CD4 - Samsung tablet, black, located behind fron t counter by Det. Lilienthal. Item retained by D~ Lilienthal to g~ DCFL. | 64525 | 1 |

Plaintiff Exhibit
# 24
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 25

21AD01658
WTSR
Warrant – Search
14031764

FILED
CIRCUIT COURT

2021 JUL -2 PM 12: 43

DESCHUTES COUNTY
SEARCH WARRANT

21AD01658

4
5 **STATE OF OREGON**                           |
6 **COUNTY OF DESCHUTES**                   |
7                                                              |
8
9 ## To Any Peace Officer in the State of Oregon, Greetings:
10

11 Upon information given under oath to me by an affidavit signed and sworn to by Deputy Michael

12 Hudson of the Deschutes County Sheriff's Office, this Court finds probable cause to believe the items

13 described below are presently located in the area described and that evidence of the crime(s) of

14 Practice of Massage Without License Prohibited, ORS 687.021 (ORS 687.991 – Criminal Penalties),

15 crime(s) committed and triable in Deschutes County, Oregon, will be located therein:

16

17 ## Pursuant to O.R.S. 133.575, You are Hereby Ordered to Search and/or

18 ## Seize:

19

20 • The business is located at 371 W Cascade Ave, Sisters, Deschutes County, Oregon. The main

21     structure is painted brown with brown trim, and has no garage. The business name, "Hop In The

22     Spa" is prominently displayed on the front of the building, and there is a sign displaying the

23     business name close to the sidewalk in the front yard. The business resembles an old western

24     farm house with vertical dark brown wood siding. The roof is constructed of wood cedar

25     shingles. The structure is two stories with an "A" frame pitched roofline but appears as a one

26     story from the street view with a small covered front porch. The structure is set back onto the lot

27     about 30 feet from the centerline of the south sidewalk on Cascade Ave. There is a small fenced

28     front yard with a small square metal pergola with a tan canvas top acting as a gateway for the

29     walkway to the front door. The front of the business faces north towards Cascade Ave on the

30     south side of Cascade Ave. The building is the second business east of the intersection of

31     Cascade Ave and Pine St.

32

33

---

CASE NUMBER 21-030013 | Search Warrant
CASE AGENT Deputy Michael Hudson                    Desc

Plaintiff Exhibit
# 25
Date 09/12/2022

Case # 6:22-CV-01361-AA

## The Subject of Your Search and/or Seizure:

ans 06.30.21

You are authorized to photograph, ~~search for and/or~~ and seize the following evidence:

ans 06.30.21

- Digital devices capable of storing user data (i.e. cellular telephones, computers, tablets, ~~game~~ ~~units,~~ removable storage) which are in the possession of and/or accessible to Michael Patrick Boyle (DOB 5/22/1961).

- Cameras, microphones, recording devices, and audio/video recordings related to Hop In the Spa business operations.

ans 06.30.21

You are further ordered to photograph, seize, ~~and/or analyze~~ any of the above listed items and make a return of this warrant to me within five (5) business days of its execution.

( ) This warrant is to be executed between 07:00 AM and 10:00 PM.

(✓) This warrant is authorized at all hours, day or night, per ORS 133.565 (3).

(✓) This warrant may be executed within 10 days of issuance, per ORS 133.565 (3)

- Items seized shall be returned within 30 days from date of seizure unless another warrant extends this 30-day time limit.

Issued over my hand at _11:49_ am/pm, on this _30th_ a day of _June_, 20_21_.


_Alycia N Sykore_

**Signature of Circuit Court Judge**

**Deschutes County**

_Alycia N Sykore_

**Printed Name of Circuit Court Judge**

**Deschutes County**

CERTIFIED TRUE COPY OF THE ORIGINAL
Dated this __ day of ___ 20__
CIRCUIT COURT OF THE STATE OF OREGON
FOR DESCHUTES COUNTY
BY ___
COURT CLERK

CASE NUMBER 21-030013 | Search Warrant
CASE AGENT Deputy Michael Hudson

Plaintiff Exhibit #2 2 of 2

Date 09/12/2022

Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 26



Plaintiff Exhibit
#26
Date 09/12/2022

Case # 6:22-CV-01361-A/

# EXHIBIT 27

Plaintiff Exhibit
# 27
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 28.0



COFFEE · HOT COCOA · GOLDEN MI

EXTEND YOUR ENERGY | BOOST YOUR PERFORMANCE



Plaintiff Exhibit
# 28
Date 09/12/2022
Case # 6:22-CV-01361-AA



START

# EXHIBIT 28.1



Plaintiff Exhibit
# 224
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 28.2



Plaintiff Exhibit
# 282
Date 09/12/2022
Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 28.3



Plaintiff Exhibit
# 263
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 31

# 000c OLCC email

## Michael Hudson

| | |
|---|---|
| **From:** | Jurik Andrew * OLCC |
| **Sent:** | Wednesday, April 28, 2021 2:52 PM |
| **To:** | Michael Hudson |
| **Subject:** | RE: Liquor License question |

[EXTERNAL EMAIL]

Mike,
Hop in the Spa located at 371 W Cascade Ave in Sister has an inactive license which they surrendered back in 2019.
So they don't have one.

Hope that helps, let me know if there is anything we can help with.

Thank you

Andy Jurik
*Oregon Liquor Control Commission*



www.oregon.gov/olcc

**From:** Michael Hudson [mailto:Michael.Hudson@deschutes.org]
**Sent:** Wednesday, April 28, 2021 9:37 AM
**To:** Jurik Andrew * OLCC
**Subject:** Liquor License question

Andrew,

I am wanting to see if Hop Inn the Spa. Located at 371 W Cascade Ave in Sisters, has a Liquor License and if it is valid/current.

Thank you,

Mike

Plaintiff Exhibit
# 31
Date 09/12/2022
Case # 6:22-CV-01361-AA

1

185

# EXHIBIT 32









Plaintiff Exhibit
#32
Date 09/12/2022
Case # 6:22-CV-01361-AA

EXHIBIT 32

# EXHIBIT 33



Plaintiff Exhibit
#32
Date 09/12/2022
Case # 6:22-CV-01361-AA

Case 6:22-cv-01361-AA

# EXHIBIT 34



C DAVIS - BWC - 07.01.2021 0424 AM

Plaintiff Exhibit
# 24
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 35

 

# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2020-00105987**

---

## NARRATIVE

Supplemental Report By: Deputy Michael Hudson

Date: 09/08/2022

**Attachments:**

1. 09/02/2022 1st email (2 pages)
2. 09/02/2022 2nd email (4 pages)
3. 09/07/2022 3rd email (13 pages)

**Narrative:**

On 09/08/2022, I contacted Toni Contreras by phone to discuss a set of emails she had recently received and spoke with LT Chad Davis about involving Hop In The Spa.

*** *It should be noted this case # (2020-105987) is peripherally associated with the criminal case involving Hop In The Spa and Michael Boyle. Ms. Contreras was not a victim nor interviewed by me during my criminal investigation of Boyle. This case was inadvertently grouped together with the other cases involving Boyle and the Spa.* ***

The criminal cases of Boyle **NOT** associated with this case are:
**21-35173, 21-21426, 21-30013, 21-35151, 21-35317**

The first two emails sent to Toni were on 09/02/2022 by someone claiming to be *"Jeannie Dreamin"*, a reporter, from WWC (an unknown business) out of Stanford, CA. The email claims Toni is named as the defendant in a large lawsuit involving Hop In The Spa. about 30 minutes after the first email, Ms. Dreamin sent Toni the second email with two attachments - a first page draft of a complaint out of the Deschutes County Circuit Court & page 15 of a supplemental report from this case written by Detective Josh Barker. On 09/07/2022, Toni received an email from Boyle directly with an 11 page complaint attached to the email.

---

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **Hudson, Michael 10L46** | **09/08/2022** | **Davis, Chad Everett** |

Plaintiff Exhibit
# 78

Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 36




# DESCHUTES COUNTY SHERIFF'S OFFICE

**CASE SUPPLEMENT REPORT**

63333 West Highway 20

Bend, OR 97701

CASE# **2021-00030013**

## NARRATIVE (Continuation)

found in various locations in and around the bar area.

Also discovered in the Aurora room were two massage tools – a Homedics four prone electric massager blue & white in color, and a blue & white Conair electric massager. Both massage tools appeared to have the mineral compound on them. Boyle stated he used both devices for himself only and had never used them on a client. Both items were seized and entered into evidence.

I also found a black piece of heavy card stock paper card stock taped with clear tape to the drywall as I was walking up the stairs. The card stock also had clear tape on the bottom of it but the tape was folded over the paper and not affixed to the wall.

I lifted the piece of paper and found a hole in the drywall about the size of a nickel. I looked through the hole and could see into the soaking room with a clear view of the tub on the far wall, the west wall of the building. There were other small holes near the concealed hole but they appeared to be filled with plastic drywall anchors with screws. I walked into the soaking room and saw the hole just slightly above towel bar screwed to the same wall. This hole appeared to not be visible from someone sitting in the left-hand wall due to the installed towel bar below.

I walked back outside and asked Boyle about the concealed hole in the wall with a view into the soaking room. Boyle denied knowing anything about the hole. I had Deputy Morris and LT Davis photograph the "peep hole" from both sides and from different angles. The taped black card stock was collected and entered into evidence.

As I was interviewing Dana, Melea, and Donica, all of them stated they had been instructed by Boyle to soak in the west tub and face the back wall (the tub on the right when facing the mirror on the back wall). If an individual was looking through the peep hole from the stairway side, they would have an unobstructed view of the person in the right tub, the same tub all three women were soaking in. If a woman was soaking naked in the tub, which Boyle heavily promoted to his customers according to the women I have interviewed, a person looking through the "peep hole" could observe a woman in a state of undress without their knowledge.

The women who had soaked in the right-hand (west) tub and their partner in the left-hand (east)tub were as followed:

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| Hudson, Michael 10L46 | 07/19/2021 | Davis, Chad Everett 07/20/2 |

DCSO

Plaintiff Exhibit
#_36_
Date 09/12/2022

Case # 6:22-CV-01361-AA

# EXHIBIT 37

© 2010 AGRR Magazine. All rights reserved. No reproduction of any type without expressed written permission.

Contents | Search | Archives | E-Mail | Subscribe



**The Only Magazine Devoted Exclusively to the Auto Glass Industry**

January/February 2010 — Volume 12 • Issue 1

Free Subscription Form on Page 51

# The Big 10

Special 10-Year Anniversary Issue

Plaintiff Exhibit #27
Date 09/12/2022
Case # 6:22-CV-01361-AA


# The Repair Revisionists

The repair industry has grown a great deal not only since it was invented, but over the last 10 years as many in the industry have worked to raise its awareness not only in the auto glass industry at large, but also among consumers. There are several industry participants to which much of this growth can be attributed.

The last ten years has not only seen this awareness grow, but also has seen the advent of a repair standard designed specifically for the industry, the growth of the National Windshield Repair Association and the advent of a new association dedicated to repairing and restoring all types of glass.

## Allan Skidmore - TCG International Inc., British Columbia



Allan Skidmore is the co-executive chairman and chief executive officer of TCG International Inc. in Burnaby, British Columbia.

Skidmore has been known for leading the company in marketing windshield repair on a widespread basis and launching one of the first repair franchise models throughout North America. The company's auto glass divisions include Speedy Glass, NOVUS, Trans America Glass Network, Shat R Proof and Windshields.com.

### Where Is He Now?

Skidmore counts his 87-year-old father, who founded the company, as his hero. "Even though the company was passed to my brother and me in 1987, he is still very active and comes into the office every day to share lunch and to keep up with what's going on," says Skidmore.

In the next ten years, Skidmore anticipates a growth in online glass transactions in the industry, including the company's own site, www.windshields.com.

"Online glass transactions will form a major part of the retail glass business," he says. "Businesses will need to embrace this new way of operating to survive. With this change, I still expect to see the independent family operations existing with the major operators throughout Canada and United States."

Skidmore also predicts a growth in cash business.

"I see the cash segment of the business growing and taking a larger percentage of the industry working with the insurance companies," he says. "I'm not saying the insurance industry will not continue to dominate the industry for an undetermined time, but the car owners will drive that change. With respect to glass replacement, I do not see the industry completely dominated by one company forever...".

## David Taylor and Cindy Rowe-Taylor
### Cindy Rowe Auto Glass, Harrisburg, Pa.



David Taylor, a past long-time president of the National Windshield Repair Association (NWRA) and former chief operating officer for Cindy Rowe Auto Glass in Harrisburg, Pa., and Cindy Rowe-Taylor, could be seen as the repair industry's First Couple. They not only have created one of the strongest regional brands in the nation, but also taught the industry that repair can make a truly viable—and successful—business.

Cindy Rowe-Taylor started the company in 1980 and began performing repairs out of her Chevrolet Vega. Taylor, who'd spent 24 years in the department store industry, joined the company in 1986—one year after the two wed. In 1987, the company purchased an existing auto glass replacement business in Harrisburg, Pa., and integrated it into the existing [...] The business had grown to 12 locations scattered th[...] Maryland prior to its purchase in 2008 by Belron US[...]

### Where Is He Now?

Taylor and Rowe-Taylor sold the business in late [...] tired from the industry. The two spend a good deal [...] bicycling tours, and in 2009 visited the Eastern S[...] Michigan and South Africa.

In addition to traveling, Taylor has been worki[...] with the marketing of his financial planning practice, while Rowe-Taylor con-[...]

## Mike Boyle
### National Windshield Repair Association, Bend, Ore.



[...]ke Boyle, presi[...] of the National [...]shield Repair [...]ciation (NWRA), [...] became known [...]e industry dur[...] the memorable [...] repair industry challenge in [...]necticut, during which the state's

Plaintiff Exhibit
# 37
Date 09/12/2022
Case # 6:22-CV-01361-AA

# EXHIBIT 38

# Former Auto Glass Exec Arrested for Sexual Assault, Sheriff Declines to File Charges

4:16

 August 30, 2021 by Rebecca Barnabi
rbarnabi@glass.com

"Which office do I go to [to] get my reputation back?"

First uttered by former Labor Secretary Raymond J. Donovan upon the dropping of larceny charges against him in 1987, those words ring true to Mike Boyle of Bend, Oregon.

Boyle is well known in the auto glass industry. A former employer, a windshield repair supplier, alleged patent infringement and filed suit against him, in 2012. The employer dropped the suit in 2017 citing Boyle's financial issues as the reason. During that time, Boyle founded and sold another windshield repair supplier, also based in Bend, Oregon.

Boyle then opened *Hop in the Spa* in Sisters, Oregon. It was billed as the country's first beer spa, which offers customers a soak in a tub of beer, along with dinner and a movie.



Former auto glass exec Mike Boyle.

However, legal trouble found Boyle again in June 2021, when a woman who was a customer in the beer spa accused Boyle of assault.

Boyle had allegedly been giving massages in his place of business without a legal license to do so. He was arrested on three counts of practicing massage without a license, one count of sex abuse, and one count of harassment. According to Oregon law, third-degree sex abuse is considered a Class A misdemeanor.

After an investigation which ended in late July, the Deschutes County Sheriff's Office declined to file charges. citing insufficient evidence.. However, the Oregon State Board of Massage Therapy is expected to conduct an investigation into Boyle allegedly practicing massage without a license.

Boyle says he is considering legal action against the state of Oregon, Deschutes County and the district attorney.

"How do I get my reputation back? I can't," he says.

Boyle filed a motion in Deschutes County on August 23 for release of information, according to Deschutes County Circuit Court.

Boyle says he wants 14 electronic items that the sheriff's office seized as evidence, via a search warrant, returned to him. The items include phones and flash drives.

His
case

This site uses cookies which allow us to give you the best browsing experience are files stored in your browser and are used by most websites to help persona experience. By continuing to use our website, you are agreeing to our use of co please see our Privacy Policy.

Plaintiff Exhibit
#36
Date 09/12/2022
Case # 6:22-CV-01361-AA

Plaintiff Exhibit